**UNITED PAPERWORKERS INTERNATIONAL UNION, Plaintiff–Appellee–Cross–Appellant,**

v.

**INTERNATIONAL PAPER COMPANY, Defendant–Appellant–Cross–Appellee.**

**Nos. 865, 999, Dockets 92–9199, 92–9225.**

United States Court of Appeals, Second Circuit.

Argued Jan. 5, 1993.

Decided Feb. 12, 1993.

Richard G. McCracken, San Francisco, CA (Michael T. Anderson, Davis, Cowell & Bowe, San Francisco, CA, Bruce H. Simon, Stephen Presser, Cohen, Weiss & Simon, New York City, on the brief), for plaintiff-appellee-cross-appellant.

Henry L. King, New York City (Gary G. Lynch, Lisa L. Lang, Marianne Fogarty,

Stephen Edward Spelman, Davis Polk & Wardwell, on the brief), for defendant-appellant-cross-appellee.

Mary A. Kenny–Callan, Washington, DC (Joel T. Thomas, Washington, DC, of counsel), for the Coalition for Environmentally Responsible Economies as amicus curiae in support of appellee.

Before: KEARSE, WINTER, and ALTIMARI, Circuit Judges.

KEARSE, Circuit Judge:

Defendant International Paper Company ("Paper Co." or the "Company") appeals from a final judgment of the United States District Court for the Southern District of New York, Charles L. Brieant, *Chief Judge*, (1) declaring that a Paper Co. proxy statement, in opposition to a shareholder proposal submitted for consideration at the Company's 1992 annual meeting, contained misleading statements and omitted material facts, in violation of § 14(a) of the Securities Exchange Act of 1934 ("1934 Act" or the "Act"), 15 U.S.C. § 78n(a) (1988), and Rule 14a–9, 17 C.F.R. § 240.14a–9 (1992), promulgated thereunder by the Securities and Exchange Commission ("SEC"), and (2) enjoining the Company to resubmit the shareholder proposal at its 1993 annual meeting. On appeal, Paper Co. contends principally that the district court erred in ruling that the proxy statement was misleading in light of the total mix of information available to shareholders. Plaintiff United Paperworkers International Union (the "Union") cross-appeals from so much of the judgment as reflects the district court's refusal to require Paper Co., in its next proxy solicitation on the resolution, to notify shareholders of the court's ruling in the present case. For the reasons below, we reject the contentions of Paper Co.. and we conclude that the judgment should be modified to require the Company to allow the sponsor of the resolution to include a fair description of the judgment in the proxy materials to be mailed by the Company.

## I. BACKGROUND

The events and statements are not in dispute. Paper Co., a corporation whose shares are traded on the New York Stock Exchange, is a major manufacturer of paper and paper products. In connection with the Company's annual meeting scheduled for May 12, 1992, the Presbyterian Church (USA) of Louisville, Kentucky (the "Church"), which owned some 31,000 shares of the Company's stock, and the Sisters of Saint Dominic of Blauvelt, New York (collectively the "Sponsors"), sought to have the Company's shareholders adopt a resolution dealing with corporate accountability for issues concerning the environment. The resolution called for the adoption of the so-called "Valdez Principles" developed by the Coalition for Environmentally Responsible Economies ("CERES"), which called on corporations to, *inter alia*, reduce waste matter and provide for its safe treatment, market safe products and services, and provide redress for environmental damage. The Company printed the proposed resolution ("Valdez Resolution" or "proposal # 6"), together with the Sponsors' supporting statement, in its 1992 Proxy Statement ("Proxy Statement") mailed to shareholders on March 31, 1992. The resolution read as follows:

RESOLVED, that shareholders request our company to:

1. sign and actively implement the Valdez Principles; and

2. engage with shareholders, CERES, and affected communities in a continuing process to achieve a genuine and publicly trusted measure of public environmental accountability.

The Sponsors' supporting statement expressed, *inter alia*, the belief that "the growing significance of environmental issues and the impact of our company's environmental practices demand a comprehensive policy and commitment to public environmental accountability."

In the Proxy Statement, Paper Co. opposed the resolution, stating that the Company had already addressed environmental matters "in an appropriate and timely manner" and indeed was in the "forefront"

with respect to environmental protection; that certain of the Valdez Principles "may not be applicable to the Company"; and that implementation of the Valdez Resolution "would not provide any greater environmental protection than now exists." Paper Co. stated that its Board had adopted a comprehensive statement of Environmental, Health and Safety Principles ("Company Principles"), which it described as "the most recent articulation of the Company's longstanding commitment to the protection of the environment, which has been an explicit Company policy for many years." The Proxy Statement continued by stating that

the Company's environmental conduct code in fact is both more stringent and more industry specific than the Valdez Principles. In the areas of waste disposal, air emissions and groundwater, the Company has invested hundreds of millions of dollars ($110 million in 1991 alone) in technology, equipment, facilities and personnel to be at the forefront in the enhancement and protection of the environment. An environmental staff was formed by the Company many years ago to maintain compliance with environmental laws and regulations as well as Company policy. The Company regularly audits each operating unit for compliance with the letter and the spirit of those rules. A committee of the Board, the Environment, Health & Technology Committee, meets regularly to review environmental, safety and health policies and programs throughout the Company, and advise the Board of the effectiveness of these policies and programs.

The Board believes the Valdez Principles, though well-intentioned, are in many respects ambiguous and certain of them may not be applicable to the Company. The Board does not believe, for example, that the Company and its shareholders should be burdened with duplicative independent audit requirements and costs associated with additional reports, as called for by the Principles. Moreover, the Board believes that the Principles calling as they do for the selection of one director "qualified to represent environ-mental interests" are inappropriate since there are many and varied interests which shareholders have that should be the concern of all directors. Finally, the Board believes that implementation of the proposal would not provide any greater environmental protection than now exists and could be significantly more costly.

In summary, the Board believes that protection of the environment is critical to any business today, but that the environmental affairs of the Company and the interests of our shareholders are already being addressed in an appropriate and timely manner.

Approval of Item No. 6 requires the affirmative vote of the holders of a majority of the shares voting on this proposal.

### THE BOARD OF DIRECTORS RECOMMENDS A VOTE **AGAINST** THIS ITEM NO. 6

The Company Principles, which were appended to the Proxy Statement, stated, *inter alia*, that "International Paper is dedicated to safe and environmentally sound products, packaging and operations"; that "[e]nvironmental stewardship has always been an important part of International Paper's business"; that "[t]he principles are consistent with International Paper's long-standing policies on environment, health and safety"; and that the Company had a "strong environmental compliance program."

Prior to mailing the proxy materials to shareholders, Paper Co. had, as required by SEC regulations, submitted its response to the resolution's Sponsors. The Sponsors had not objected to it.

In April 1992, however, the Union, which in recent years had had an unusually tense relationship with the Company and which owned 25 shares of the Company's stock, commenced the present action, contending that the Company's Proxy Statement response to the Valdez Resolution contained false and misleading representations and omissions. As discussed in greater detail below, the Union alleged that, as revealed in Paper Co.'s Form 10–K Report, which

was filed with the SEC but not distributed to shareholders, the Company had been accused of numerous environmental offenses, had pleaded guilty to felonies, had agreed to pay huge fines, and had been the target of numerous administrative complaints.

The Union moved for a preliminary injunction to delay the annual meeting pending communication by the Company to shareholders of complete and accurate information with regard to its environmental record. In opposition, the Company argued that the shareholders had or had access to sufficient information. After an expedited hearing on the motion, the court declined to enjoin the meeting. At the meeting, the Valdez Resolution was defeated, receiving only 5.937% of the votes cast. Though this response was just short of the percentage needed to require the Company to resubmit the proposal to shareholders in 1993, the Company notified the Sponsors that it would voluntarily place the proposal on the agenda for the 1993 annual meeting.

Following its denial of the preliminary injunction motion, the district court, with the consent of the parties, converted that motion into cross-motions for summary judgment. The Company, in support of judgment in its favor, argued, *inter alia*, (1) that its Proxy Statement was not misleading standing alone, and (2) that, in any event, that statement was not misleading when read in conjunction with (a) its annual report, which was mentioned in its Proxy Statement, had been mailed to all shareholders, and contained a segment entitled "Environmental Issues" that summarized various environmental proceedings involving the Company, (b) its 10–K Report filed with the SEC, which the annual report informed shareholders they could obtain free of charge, and (c) various news reports. The Company's annual report stated as follows with respect to environmental litigation:

> In late 1990 and early 1991, several lawsuits were filed against paper producers alleging property damage or risk of personal injury resulting from the presence of dioxin in mill discharges. International Paper is named in some of these lawsuits. As anticipated, aggressive solicitation methods utilized by plaintiffs' attorneys led to the filing of several additional lawsuits in 1991, with the result that at year end, cumulative damages sought totaled more than $6 billion. Recent scientific studies indicate that earlier concerns about the adverse effects of dioxin on human health were significantly overstated. Management believes these suits are without merit and expects to prevail upon final resolution.

> Pursuant to an agreement with the U.S. Attorney in Maine, the Company pled guilty in July 1991 to five criminal charges associated with environmental violations at its Androscoggin mill and paid a $2.2 million fine. The Imaging Products Division is currently conducting soil, groundwater and air testing at its Binghamton, N.Y., Anitec facility under a consent order with the State of New York to determine the extent of contamination and remedial action required due to accidental discharges. The Division's film base production process, which was a principal source of the environmental impact, was shut down in 1991. Environmental reviews are also under way at other locations, including certain Arizona Chemical and Masonite facilities.

> . . . .

> International Paper is also a party to other environmental remedial actions under various federal and state laws.

Though some of the Company's involvement in environmental litigation was thus adverted to in the annual report, the Union pointed out that a number of unfavorable details were not mentioned. For example, the five criminal charges to which the Company had pleaded guilty in July 1991 in federal court in Maine were felonies; they involved not only violations of hazardous-waste laws but also the falsification of required environmental reports; and the $2.2 million criminal fine to which the Company agreed was the second largest fine ever assessed for violation of the hazardous-waste laws. Though the annual report mentioned that Paper Co. was conducting air, soil, and groundwater testing at its

Binghamton plant pursuant to a consent order, it did not mention that the Company anticipated additional orders and fines relating to environmental matters at that facility. And though the annual report noted that "several" private environmental lawsuits had been filed against paper producers and that the Company was named in "some" of those suits, in fact as of January 1992 the Company was a defendant in 43 civil actions relating to pollution of three rivers in Mississippi alone.

In addition, neither the Proxy Statement nor the annual report mentioned several other matters, including (a) that though in April 1991, the Company settled a civil suit brought by the State of Maine and the Maine Board of Environmental Protection for violations of state environmental laws and regulations, the Company had failed to perform its obligations under the settlement agreement and the State had returned to court seeking substantial penalties for noncompliance; (b) that as of March 30, 1992, the Company had been named in a large number of administrative proceedings to enforce environmental and safety laws or regulations, including approximately 50 proceedings brought under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* (1988), and comparable state laws, relating to hazardous wastes at commercial landfills; and (c) that in February 1992, the United States Environmental Protection Agency ("EPA") had initiated proceedings to bar the Company from doing business with the federal government for a period of three years.

In a Memorandum Decision dated August 17, 1992, and reported at 801 F.Supp. 1134, the district court ruled that Paper Co.'s Proxy Statement violated § 14(a) and Rule 14a-9 by making materially misleading statements and omitting material facts. The court found that the Company's contention that the Proxy Statement itself was not misleading was

> palpably without merit. Specific statements in both the Board's response to the proposal, such as the representation that the Company has "a longstanding

commitment to the protection of the environment", and in the Company's "Environmental, Health and Safety Principles", such as the representation that the Company has "a strong environmental compliance program", are, to put it charitably, inconsistent with the serious and ongoing environmental challenges the Company has endured. . . .

> Moreover, even if the Court could not identify specific statements that are at variance with the facts, the total impression conveyed by the Board's glib response to this proposal is that the Company is a model of environmental rectitude. Nowhere in any of these materials is there even a bare acknowledgement that the Company has had its share of difficulties in this area.

801 F.Supp. at 1140–41. The court also found that there was no genuine issue as to scienter, stating that the Company

> cannot argue with any rationality that the Board's response to the shareholder proposal was anything but a calculated attempt to mislead the shareholders and induce them to cast a negative vote. The Board was presumptively and constructively aware of all relevant details of the Company's environmental record; rather than portraying that record accurately, or remaining silent, it chose instead to engage in flowery corporate happy-talk in order to defeat the proposal. The undisputed evidence compels a finding that the Board acted with the requisite knowledge and intent in making the misstatements and omissions detailed above.

*Id.* at 1144.

The court accepted the Company's contention that its annual report should be considered part of the information reasonably available to the Company's shareholders but concluded that press reports and the 10–K Report filed with the SEC should not. The court found that the statements made in the annual report were insufficient to cure the misleading effect of the Proxy Statement for two reasons:

> First, there is *no* mention in either the statement in opposition to proposal # 6

or in the annexed appendix of "Principles" of any of the recent or pending proceedings against the Company; nor is the relevant section of the Annual Report, which does discuss the Company's environmental record in a somewhat more balanced fashion, even referred to....

Second, the Board's discussion of environmental issues in the Annual Report simply does not disclose information sufficient to enable a shareholder to make a reasoned judgment on whether proposal # 6 merits support.... For example, though the Company's guilty plea in the District Court in Maine is mentioned, the fact that the crimes were felonies, two of which involved knowingly illegal conduct, is not disclosed. There is no mention of the pending EPA debarment action. Beyond the bland statement that "International Paper is also a party to other environmental remedial actions under various federal and state laws", ... there is no discussion of the actions initiated by the State of Maine and the State of Missouri, nor are the PCB enforcement action in Washington State and the fifty administrative proceedings under CERCLA disclosed.

801 F.Supp. at 1142 (emphasis in original; footnote omitted). The court concluded that

> the Board's response to shareholder proposal # 6 contained both misleading statements and omissions, that such statements and omissions were made knowingly, and that they had a "significant propensity" to affect the vote on the proposal. The plaintiff's motion for summary judgment is therefore granted. The result of the shareholders' vote on proposal # 6 must be, and hereby is, voided, and the Board is directed to resubmit the proposal to a vote of the shareholders at the Company's next Annual Meeting.

*Id.* at 1147.

In connection with the final judgment to be entered, the Union urged, as discussed in greater detail in Part III below, the court to require Paper Co. to include in its 1993 proxy statement a disclosure of the judgment in the present action, lest the Company attempt to give shareholders the impression "that they didn't do anything wrong the first time around." The court declined, stating that, "I haven't concluded they did anything wrong. I concluded they violated the statute and its rules. This is not an issue of right or wrong. This is an issue of statutory compliance." The court suggested that the Union should perhaps "take a cross-appeal. I don't really believe it's necessary for me to do that."

Judgment was entered principally declaring that the Company had violated § 14(a) and Rule 14a–9 and enjoining the Company to resubmit the Valdez Resolution at the 1993 annual meeting. These appeals followed.

## II. THE RULING THAT THE PROXY STATEMENT WAS MISLEADING

On its appeal, Paper Co. contends principally that the district court erred in finding a violation of § 14(a) and Rule 14a–9 because (a) the Proxy Statement, either standing alone or read in conjunction with the annual report, was not materially misleading, and (b) in any event, those two documents read with the 10–K Report and press reports adequately disclosed all material facts. We find no merit in these contentions.

 Preliminarily, we note that Paper Co. also challenges the Union's standing to bring this action. It argues that the Sponsors have the greatest "commitment to [the] proposal" and that the private right of action should not be extended to others. We reject this suggestion. Section 14(a) of the 1934 Act was enacted in "the congressional belief that '[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'" *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964) ("*Borak*") (quoting H.R.Rep. No. 1383, 73d Cong., 2d Sess. 13 (1934)). The SEC, empowered by the Act to adopt "'such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest *or*

*for the protection of investors,'* " *Borak,* 377 U.S. at 432, 84 S.Ct. at 1559 (quoting § 14(a)) (emphasis in *Borak*), promulgated Rule 14a–9 with the goal of preserving for all shareholders who are entitled to vote, not just for those who sponsor proposals, the right to make decisions based on information that is not false or misleading. · *Cf. Statement of Informal Proposals for the Rendering of Staff Advice with Respect to Shareholder Proposals,* Exchange Act Release No. 12,599, 41 Fed.Reg. 29,989, 29,-990 (1976) (indicating agency view that private suit even to compel company to submit shareholder proposal to shareholders may be instituted by "the proponent, or any shareholder for that matter"). The *Borak* Court found that implicit in § 14(a)'s broad remedial purposes, which include promotion of the free exercise of the voting rights of stockholders and the protection of investors, was the availability of judicial relief where necessary to achieve that result. 377 U.S. at 432, 84 S.Ct. at 1559. We see no sound basis for denying a right of action to any shareholder who seeks to remedy the issuer's misleading statements in or omissions from proxy materials circulated in connection with a matter submitted for shareholder vote. Accordingly, we conclude that the Union as a shareholder has standing to bring this suit, and we turn to the merits.

 Section 14(a) of the Act makes it unlawful to solicit proxies in contravention of any rule or regulation promulgated by the SEC. 15 U.S.C. § 78n(a). Rule 14a–9 promulgated thereunder prohibits the inclusion in a proxy statement of

> any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, *or which omits to state any material fact necessary in order to make the statements therein not false or misleading.*

17 C.F.R. § 240.14a–9 (emphasis added). A fact is material for purposes of Rule 14a–9 " 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.' " *Virginia Bankshares, Inc. v. Sandberg,* —

U.S. ——, ——, 111 S.Ct. 2749, 2757, 115 L.Ed.2d 929 (1991) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). " 'Once the proxy statement purport[s] to disclose the factors considered [by the board of directors] . . ., there [i]s an obligation to portray them accurately.' " *Virginia Bankshares, Inc. v. Sandberg,* —— U.S. at —— n. 7, 111 S.Ct. at 2761 n. 7 (quoting *Berg v. First American Bankshares, Inc.,* 796 F.2d 489, 496 (D.C.Cir. 1986)).

In the present case, Paper Co. responded to the shareholder proposal in the Proxy Statement with a rather glowing description of the Company's environmental spirit, performance, and sense of responsibility. Plainly, a reasonable shareholder would consider the Company's actual record important in assessing the merits of the Company's response to the shareholder proposal. The response was, therefore, misleading absent a description of the Company's record of environmental derelictions or noncompliance.

 In considering a claim of material omission in violation of Rule 14a–9, however, the court ordinarily should not consider the proxy statement alone. To succeed on such a claim, the plaintiff must show that there was "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. ·v. Northway, Inc.,* 426 U.S. at 449, 96 S.Ct. at 2132.

A. *"Total Mix" and the 10–K and Press Reports*

 The "total mix" of information may include data sent to shareholders by a company in addition to its proxy materials, *see, e.g., Ash v. LFE Corp.,* 525 F.2d 215, 219 (3d Cir.1975) (proxy statements need not "duplicate the financial data furnished to shareholders in the corporation's annual reports"), as well as other information "reasonably available to the shareholders," *Rodman v. Grant Foundation,* 608 F.2d 64, 70 (2d Cir.1979). However, "not every

mixture with the true will neutralize the deceptive," *Virginia Bankshares, Inc. v. Sandberg,* — U.S. at ——, 111 S.Ct. at 2760, and even information actually sent to shareholders need not be considered part of the total mix reasonably available to them if "the true" is "buried" in unrelated discussions, *see, e.g., Rodman v. Grant Foundation,* 608 F.2d at 70 (proxy statement deemed adequate in part because information "was not 'buried' by being disbursed among or immersed in irrelevant data"). The mere fact that a company has filed with a regulatory agency documents containing factual information material to a proposal as to which proxies are sought plainly does not mean that the company has made adequate disclosure to shareholders under Rule 14a–9. Corporate documents that have not been distributed to the shareholders entitled to vote on the proposal should rarely be considered part of the total mix of information reasonably available to those shareholders.

The "total mix" of information may also include "information already in the public domain and facts known or reasonably available to the shareholders." *Rodman v. Grant Foundation,* 608 F.2d at 70; *see Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir.1978). Thus, when the subject of a proxy solicitation has been widely reported in readily available media, shareholders may be deemed to have constructive notice of the facts reported, and the court may take this into consideration in determining whether representations in or omissions from the proxy statement are materially misleading. *See, e.g., GAF Corp. v. Heyman,* 724 F.2d 727, 729 (2d Cir.1983) (" 'total mix' of information available ... included the many news stories that the closely watched contest had generated"); *Seibert v. Sperry Rand Corp.,* 586 F.2d at 952 (material in "public domain" and therefore readily available included information "reported countrywide in the press and on radio and television," and "a nationwide consumer boycott ... accompanied by massive media advertising"). However, the mere presence in the media of sporadic news reports does not give shareholders sufficient notice that

proxy solicitation statements sent directly to them by the company may be misleading, and such reports should not be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials.

In the present case, the district court properly rejected Paper Co.'s contention that public press reports and its 10–K Report should be viewed as part of the total mix of information reasonably available to shareholders. Though the Company argued that news articles should be considered, the articles were few in number, narrow in focus, and remote in time. The Company pointed to only eight articles, and they apparently dealt only with the Company's litigation in the states of Maine and Mississippi, reporting its plea of guilty in the former and ongoing lawsuits in the latter. Further, these articles were not published in the context of this proxy contest. Rather, they spanned more than a year; the latest of them had appeared more than two months before the Company's Proxy Statement was even issued; and all but one had appeared more than six months earlier. These articles were properly considered not to be part of the information that was reasonably available to shareholders.

Nor was the Company's 10–K Report part of the reasonably available mix. That report was filed with the SEC, not distributed to shareholders. Nothing in any of the documents sent to shareholders highlighted the 10–K Report. The Proxy Statement did not mention it at all; and the annual report made no reference to it in its description of the Company's environmental record. Indeed, in each link of the chain of references on which the Company now relies the pertinent reference was a general one widely separated from any environmental discussion. Thus, the Proxy Statement's mention of the annual report appeared only as a general reference on page 2 of the Proxy Statement; the annual report's reference to the availability of the 10–K Report appeared only as an unen-

lightening statement on the inside of the annual report's back cover:

This Annual Report includes most of the *financial* information required to be on file with the Securities and Exchange Commission and is incorporated in our Form 10–K. The Company will be pleased to provide a copy of its 1991 Annual Report or Form 10–K free of charge upon request.

(Emphasis added.) Nothing in this reference or in the annual report's description of environmental matters suggested that there existed additional environmental facts and proceedings adverse to the. Company, much less that they could be learned from the Company's 10–K Report. In short, a reasonable shareholder who was interested in the Valdez Principles and had read both the Proxy Statement and the annual report would have received no indication that additional information pertinent to the Valdez Resolution was available in the 10–K Report.

We conclude that the district court correctly ruled that the press reports and the Company's 10–K Report to the SEC were not part of the total mix of information reasonably available to shareholders about to vote on the Valdez Resolution.

B. *The Proxy Statement and the Annual Report*

■ There can be no serious question here that the Proxy Statement standing alone was materially misleading with respect to the Company's environmental record. The stated purpose of the Valdez Principles was to "achieve a genuine and publicly trusted measure of public environmental accountability." The Company's representations, in opposition, that it had a longstanding commitment to the protection of the environment, that it was a leader in environmental protection, that it had a vigorous compliance program, and that it had addressed such issues appropriately, conveyed an impression that was entirely false.

The annual report, which the district court treated as part of the total mix reasonably available to shareholders, presents

its own special problems. Had the Company's misleadingly self-laudatory statements not been made, and had the disclosures made in the annual report appeared in the Proxy Statement, we would likely consider the disclosures not to be materially incomplete. On the other hand, given the unqualifiedly glowing statements that were actually made in the Proxy Statement, we consider it a close question whether such disclosures as were made in the annual report should be deemed part of the total mix available to shareholders or should instead be deemed buried in a part of the report where one seeking environmental information, might not think to look. The major headings in the annual report were "Financial Highlights," "To Our Shareholders," "International Paper in the 1990s," and about a dozen others, none of which mentioned the environment. In the section boldly headed "International Paper in the 1990s," there were smaller subheadings, to wit, "Customers," "Value Added Products," "Global Presence," "Manufacturing Efficiency," and "The Environment: Steadily Improving Performance." This environmental section, though not quite as self-laudatory as the Proxy Statement, was nonetheless unqualifiedly positive. Such negative information as was included in the annual report was set out some 20 pages later in a section that bore the heading "Environmental Issues" in less prominent type and was placed in an untitled financial summary section describing the Company's investment activities, capital resources, and capital expenditures. This more informative "Environmental Issues" section was sandwiched between sections headed "Other Financial Statement Items and Accounting Standards Changes" and "Effects of Inflation."

We need not decide, however, whether the annual report should have been ruled not part of the total mix here, for we agree with the district court that even such disclosures as could be found in that report were not sufficient in light of the pristine picture painted by the Proxy Statement. Shareholders could have viewed the disclosures made in the annual report as not being inconsistent with the Company's

"achieve[ment of] a genuine and publicly trusted measure of public environmental accountability" had they read only the Proxy Statement and the information disclosed in the annual report. For example, reading only the annual report, they could have believed that the five pleas of guilty were for minor infractions that did not bespeak a lack of corporate responsibility; they would likely have viewed the Company's statements in a different light had they known that the charges were not minor but felonies, that the $2.2 million fine was the second largest ever assessed for violation of hazardous-waste laws, and that some of the felonies involved falsification of required environmental reports. They would undoubtedly have been considerably enlightened as to the sincerity of the Company's claimed explicit policy and firm longstanding commitment for protection of the environment had they known the facts, undisclosed by the annual report, that the Company had falsified environmental reports and breached the settlement agreement it had reached in the Maine civil litigation. Shareholders could have believed the Company's claimed "strong compliance program" was not belied by the mere fact that the Company had been sued in "some" of "several" lawsuits as described in the annual report; they would have had a decidedly different picture had they also known facts not disclosed in that report, including that there were 43 such suits charging the Company with having dumped chemically contaminated waste in three rivers in one state alone, that the Company had been named in more than 50 administrative proceedings to enforce federal and state laws governing treatment of hazardous wastes, and that the Company's record was such that the EPA was seeking to prohibit it from doing business with the federal government for three years.

In sum, the disclosures contained in the annual report failed to cure the materially misleading representations and omissions in the Proxy Statement. The district court properly ruled that the Company had violated § 14(a) and Rule 14a–9.

## III. CONTENTS OF THE 1993 PROXY SOLICITATION

On its cross-appeal, the Union contends that the judgment of the district court should be modified either to (1) require Paper Co., in its 1993 proxy statement, to describe the judgment against it in the present suit, or (2) require the Company to permit the Church, as sponsor of the resolution, to include a description of the judgment in its sponsoring statement. Though we reject the first contention, we conclude, in light of postjudgment clarification of the Company's position, that the second has merit.

In the district court, the Union urged the court to include in the final judgment a requirement that the Company disclose in its 1993 proxy materials for the 1993 annual meeting

(i) that [the district court] has declared the Board of Directors' March 31, 1992 proxy statement responding to the [Valdez Proposal] materially false and misleading in violation of federal securities law; (ii) that [the district court] has declared the shareholder election held May 12, 1992 on [proposal # 6] null and void; (iii) that [the district court] has ordered the Company to resubmit the [Valdez Proposal] for a new vote of the shareholders.

After hearing argument, the court declined to require the Company to include in its own statement the description urged by the Union.

A district court's decision not to issue an injunction is reviewed under an abuse of discretion standard, *see, e.g., SEC v. Parklane Hosiery Co.*, 558 F.2d 1083, 1090 (2d Cir.1977), and, on the basis of the record as it stood in the district court, we see no abuse of discretion in the decision of the district court not to order the Company to include the proposed description in its own statement opposing the resolution as resubmitted in the 1993 proxy statement. We see no indication, however, that the district court purported to rule on whether the sponsor of the resolution could describe the judgment in its statement in support of the resolution.

In opposing the request that the judgment include such a description, the Company's counsel had represented that the sponsor itself would "have a full and fair opportunity both to prepare its own materials for submission to the shareholders and to review the 1993 proxy materials prior to their publication." (Letter from Henry L. King to Richard G. McCracken, dated September 14, 1992.) After the judgment was entered, the Church amended its statement in support of the 1993 submission of the proposal by including a description of the judgment and quoting portions of the court's opinion. The Company responded that it would not include the Church's description in the 1993 proxy statement. The Union argues that if the Church is not allowed to include such a description, as a practical matter the results of this lawsuit will not be brought to the attention of the shareholders since an independent proxy solicitation would be prohibitively expensive. We are persuaded by these postjudgment events that the judgment should be modified to provide that the sponsor of the resolution may give a fair description of the present adjudication.

We reject the Company's suggestion that the question of what the sponsor may say in support of its proposal must be left to the SEC. This lawsuit has resulted in an adjudication that the Company made materially misleading representations in and omissions from its 1992 Proxy Statement in violation of § 14(a) and Rule 14a–9; and as a remedy the court has ordered the Company to resubmit the Valdez Resolution to shareholders at the 1993 annual meeting. It is well within the court's power, and is not inappropriate, to order as part of that remedy that the issuer allow the sponsor of the resubmitted resolution to state that the court ordered resubmission because of the Company's securities law violation. Thus, in light of the present dispute, which has been clarified only since the judgment was entered, we conclude that the judgment should be modified to direct that Paper Co. allow the sponsor, in connection with the resubmission of the resolution at the 1993 annual meeting of shareholders, to include in its supporting statement, which is to be included in the proxy statement sent to shareholders by the Company, a description of the ruling in the present litigation, such as the following:

(i) that the district court declared the board of directors' March 31, 1992 proxy statement, in responding to the Valdez Proposal, to be materially misleading in violation of federal securities law; (ii) that the district court declared the shareholder vote held May 12, 1992, on the Valdez Resolution null and void; and (iii) that the district court ordered the Company to resubmit the proposal for a new vote of the shareholders.

We leave it to the district court to resolve any further disputes as to the inclusion of additional statements, or the precise language to be used, or as to the language that the Company may use in its own portrayal of the adjudication.

## CONCLUSION

We have considered all of Paper Co.'s arguments on these appeals and have found them to be without merit. The judgment of the district court is to be modified as indicated in Part III above, and as modified, is affirmed.