**Edwin C. CROUCH, James J. Heying, and Jeffrey J. Prosser, Plaintiffs,**

v.

**Cornelius B. PRIOR, Jr., Robert A.R. MaClennan, Andrew F. Lane, Alan Hasselwander, J.B. Ellis, and Henry Wheatley, Defendants.**

Civ. No. 1995–108–F–STX.

District Court, Virgin Islands,
D. Saint Croix.

Oct. 25, 1995.

Joel H. Holt, Diane M. Russell, Holt & Russell, Christiansted, St. Croix, VI, Richard B. Drubel, Charles R. Eskridge, III, Geoffrey L. Harrison, Susman Godfrey L.L.P., Houston, TX, for Plaintiffs.

George H.T. Dudley, Henry L. Feuerzeig, J. Daryl Dodson, Dudley, Topper and Feuerzeig, St. Thomas, VI, John L. Warden, Diane D'Arcangelo, Sullivan & Cromwell, New York City, for Defendants.

## OPINION OF THE COURT

FINCH, District Judge:

THIS MATTER comes before the Court on plaintiffs' motion for a preliminary injunction. The parties presented evidence and arguments to this Court on October 3–4, 1995. As plaintiffs claim that defendants violated proxy rules promulgated by the Securities and Exchange Commission pursuant to 15 U.S.C. § 78n, this Court has jurisdiction over this matter pursuant to 48 U.S.C. § 1612, 28 U.S.C. § 1331, and 15 U.S.C. 78aa.

## I. BACKGROUND AND FACTS [1]

Plaintiffs Edwin C. Crouch, James J. Heying, and Jeffrey J. Prosser seek injunctive

---

1. This entire section is to be taken as this Court's     findings of fact. Both sides were given the op-

relief from this Court to preserve the *status quo* that existed on July 24, 1995. As of that date, plaintiff Prosser was a co-Chief Executive Officer and member of the Board of Directors of Atlantic Tele–Network, Inc. ("ATN"), plaintiffs Crouch and Heying were ATN officers, and defendants Alan Hasselwander, J.B. Ellis, and Henry Wheatley were not ATN Board members.

Plaintiffs allege that defendant Prior violated federal securities laws while soliciting consents from ATN stockholders. More specifically, plaintiffs in seeking a preliminary injunction presented the following claims:

(1) defendant Prior solicited more than ten persons without complying with the proxy registration rules;

(2) Joanne Smith's research note conditioned the market to make it more receptive to Prior's consent solicitation; and

(3) defendant Prior made material misstatements and omissions during his solicitation of consents.

Defendants oppose plaintiffs' petition for injunctive relief on the following grounds:

(1) defendant Prior solicited ten persons, and thus he came within an exemption to the proxy registration rules;

(2) Joanne Smith's research note was not a solicitation on behalf of defendant Prior; and

(3) defendant Prior's solicitation contained neither material misstatements nor omissions.

ATN is a multi-million dollar Delaware corporation with publicly traded shares and which through its holding company owns the Virgin Islands Telephone Corporation ("VI-TELCO") and Guyana Telephone and Telegraph Company Ltd. ("GT & T").[2] St. Croix, Virgin Islands is the principal place of business and headquarters of ATN. Before mid-April 1995, plaintiff Prosser and defendant Cornelius B. Prior, Jr. and two persons appointed by each man comprised the ATN Board of Directors.[3] Prosser and Prior served as co-Chief Executive Officers of ATN. They each owned approximately 30% of ATN's shares.

In April 1995, Prior began consulting with Lewis Stern[4] regarding a private consent solicitation that would change the composition of the ATN Board. During that same month, Prior discussed with defendants Ellis, Hasselwander, and Wheatley the feasibility of them joining the ATN Board.

On April 18–19, 1995, the four directors other than Prosser and Prior met in London and created the "London Proposals," which, if adopted as written, would have elevated Prosser to Executive Chairman of ATN and would have made Prior the chairman of the budget committee of the Board of Directors.[5] The four directors created the London Proposals to break a deadlock that existed because Prosser and Prior disagreed over many issues. On April 19, 1995, defendant Prior sent out a request for a list of ATN stockholders.

On May 7, 1995, ATN's management approved the London Proposals in a meeting with the four non-executive directors. The non-executive directors presented the Lon-

portunity to present the facts in their submissions and at a hearing. Several facts are undisputed. This section represents the facts the court finds to be true and presents them in this primarily chronological form for ease in understanding the chronology vital to determining whether defendant Prior violated federal securities laws.

**2.** ATN owns 80% of GT & T. The Guyanese government owns the remaining 20%.

**3.** Pursuant to a Shareholders' Agreement, Prosser was Chairman of ATN's board of directors and Prior was President of ATN. Alleged breaches of the Shareholders' Agreement are the subject of a separate case before the Delaware Chancery Court.

**4.** Stern is a partner with the New York law firm of Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank"). Since 1990, Stern and Fried Frank have represented Prior personally and have performed Securities and Exchange Commission-related and other legal work for ATN. Stern also served at the time as the trustee for the Charitable Reversionary Trust created by Prior which held ATN stock.

**5.** Witnesses presented conflicting testimony at the preliminary injunction hearing concerning whether the Prior-designated board members fully supported the London Proposals or only considered them a tool for negotiating the roles of Prosser and Prior within ATN and the Board.

don Proposals to the full Board at a May 8, 1995 meeting. Prior expressed his dissatisfaction with the proposals and delayed a vote on them.

Defendant Prior met on May 16, 1995 with Joanne C. Smith, a Prudential Securities analyst who followed ATN stock. The next day, Smith issued a research note that cast ATN in an unfavorable light. Although Prior did not request preparation of the research note, Smith's testimony was that the meeting served as a basis for the note. Moreover, Prior, a former Wall Street attorney and investment banker with over 20 years of Wall Street experience, knew that such meetings lead to post-meeting research notes being published. At the meeting, Prior showed Smith how to determine from documents that he gave her that ATN had written off approximately $4 million in acquisition expenses. Smith mentioned that writeoff in her research note.

On May 18, 1995, Stern and defendants Prior, Hasselwander, and Ellis met with Timothy D. Armour, Executive Vice President of Capital Research and Management Co., concerning a possible consent solicitation. Prior sent Armour a five-page letter on May 25, 1995 that solicited Armour's support for his "program for dramatic change," which included removing from the Board Prosser and his designated directors.

Since 1994, Stern served as the trustee of a Charitable Reversionary Trust created by Prior. Between May and July of 1995, Prior asked Stern to stop serving as trustee. At the time, the trust held 450,000 shares of ATN stock. Prior admitted that one reason for so doing was that this allowed him to vote the shares in the consent solicitation instead of having Stern vote the shares as the trustee. Moreover, Prior's solicitation of Stern as the trustee of the Charitable Reversionary Trust predated Prior's request to change the trustee.

■ Prior later solicited consents from other persons with the voting rights for ATN shares. In soliciting Armour, Prior solicited both Capital Research & Management Co. and Capital International, Inc. Similarly, Prior solicited (1) both Dimensional Fund Advisors, Inc. and DFA Investment Dimensions Group, Inc. by soliciting Dimensional Fund Advisors, Inc. and (2) Franklin Portfolio Associates and Mellon Bank Corporation by soliciting Mellon Bank Corporation. There is no merit to Prior's contention that the Court should take into account Prior's alleged inability to get a response from Dimensional Fund Advisors, Inc. concerning the consent solicitation. Prior solicited both Detroit Police and Fireman's Association and Kennedy Capital Management, Inc. by soliciting Kennedy Capital Management, Inc. Furthermore, Prior also solicited G.T. Capital Management, Inc., Oppenheimer Management Corporation, and Tiedemann/McCabe Global Telecom Fund.

Prior's wife, Gertrude Jollock Prior, owned ATN shares as of June 22, 1995. Prior divulged information to her about his plans for the consent solicitation. In fact, she helped Prior solicit Dimensional Fund Advisors, Inc. Therefore, Prior solicited his wife's consent as an ATN shareholder.

In early June, Prior secured the services of the New York law firm of Sullivan & Cromwell regarding the consent solicitation and the services of Georgeson & Company, Inc. ("Georgeson") to aid in executing consent forms from ten or fewer ATN stockholders.

Prosser and the two directors appointed by him held a Board meeting on June 1, 1995, which neither Prior nor the two directors designated by him attended. At the meeting, they passed a resolution giving Prosser authority as Executive Chairman to file a lawsuit in the Territorial Court of the Virgin Islands requiring ATN to abide by the terms of the London Proposals.

On June 13, 1995, Plaintiff Prosser put out an ATN press release detailing the London Proposals. The press release stated that ATN was proceeding with this restructuring plan developed by the four non-executive directors. In addition, it mentioned the Territorial Court lawsuit.

Prior claims that he did not decide until almost mid-June to engage in the consent solicitation. The alleged impetus for his decision was the lawsuit filed by Prosser and

mentioned in the June 13, 1995 press release. His actions belie such a finding. Consequently, it is clear that Prior made a decision in April to engage in the consent solicitation. Prior's actions between April and July of 1995 were part of a plan to solicit sufficient consents from ATN stockholders to change the composition of the ATN Board without having to comply with proxy registration rules.

On July 25, 1995, Prior filed consents solicited from several ATN stockholders.[6] Under Delaware law, Del.Code Ann. tit. 8, § 225, Prior's filing of consents representing 50.028% of the shares of ATN permitted a change in Board membership without the necessity for a meeting of the stockholders. Filing consents removed Prosser and Prosser-designated Board members John P. Raynor and Sir Shridath Rampal from the ATN Board. Immediately thereafter, the newly constituted Board removed Prosser as Chairman and Co–Chief Executive Officer of ATN and plaintiffs Crouch and Heying from their positions as ATN officers.

Prior did not tell Prosser that he was trying to oust him and Prosser's designees from the ATN Board by using the ten person exemption to the proxy solicitation rules because Prior did not want Prosser to come up with his own plan that might oppose Prior and thwart his efforts to control the corporation. Prior wanted to move quickly with his solicitation so he could "discourage active opposition." *See* Pls. Ex. 13 at 5.

Plaintiffs filed this lawsuit alleging (1) that defendant Prior exceeded the ten person limit for the Rule 14a–2(b)(2) exemption to the proxy registration rules and (2) that he made several material misstatements and omissions in the course of soliciting the stockholders. Defendants deny these allegations.[7]

Furthermore, plaintiffs allege, and defendants deny, that Joanne Smith's research note conditioned the market as part of Prior's plan to solicit consents.

Plaintiffs claim that the solicitation letters that Prior wrote to ATN stockholders omitted any discussion of both the London Proposals and a loss of almost $450,000. Plaintiffs attribute that loss to Prior as resulting from the sale of Maritime Cellular Tele–Network, Inc., an ATN subsidiary. Prior disputed plaintiffs' version of the facts surrounding the transaction. Furthermore, plaintiffs claim that the following misstatements were made in those same letters: (1) a statement that Prior repeatedly objected to Prosser causing ATN "to spend far too much money and executive resources prospecting for acquisitions"; (2) a statement that Prior could reduce acquisition expenses "to practically zero" by cutting out corporate airplane-related expenses; and (3) statements concerning focusing on enhancing ATN's earnings by "improving returns on telephone operations in Guyana and the V.I." In addition, plaintiffs' witnesses testified to several other statements that they claim were material misstatements. Defendants contend that the statements are true or merely show what Prior hoped to do. Defendants claim that stockholders had access to the London Proposals and that any other omission was not material. Based on the submissions of the parties, the evidence adduced by plaintiffs at the hearing, and the state of the record at this procedural posture, this Court cannot find as a fact, that the statements were material misstatements or that the omissions were material.

ATN and plaintiffs suffer and will continue to suffer injury directly attributable to the

---

**6.** Georgeson aided Prior in executing the consent forms used once Prior got the particular voting entities to agree to consent. A total of 23 consent forms were signed that together represented nine consenting voting entities plus a total of 3,692,850 shares controlled by Prior. Several voting entities represented more than one legal owner of the shares. Prior signed one of the consent forms representing 150,000 shares. With the exception of that one consent signed by Prior, the consents were signed by Cede & Co as the nominee of The Depository Trust Company, the record holder of ATN's shares. One of the consent forms signed by Cede & Co. was for 3,542,850 shares controlled by Prior.

**7.** In addition, defendants presented affidavits stating that Timothy D. Armour, Executive Vice President of Capital Research and James M. McCabe, fund manager of Tiedemann/McCabe Global Telecom Fund, would not change their votes even after they read the memorandum of law that plaintiffs filed in connection with this case.

consent solicitation in violation of the proxy registration rules and the posture of Prior towards GT & T's operations and the Guyanese government. ATN suffers and will continue to suffer injury, because the Guyanese government is opposed to Prior's methods of operating GT & T. It is not disputed that GT & T accounts for a substantial portion of ATN's revenues. Defendant Prior considers as outmoded the contractually agreed upon expansion plan for GT & T that the Guyanese government wants to have completed. He is not opposed to completing the plan, but he will not put more money into completing the plan until he can convince the Guyanese government to detail what the plan should be. The government extended the completion date for the expansion plan several times and considers the completion of the plan to be long overdue. Prior's posture contributed to the government's dissatisfaction with ATN.

The Guyanese government filed a complaint with the Public Utilities Commission[8] (the "PUC") in Guyana concerning GT & T's noncompliance with the government's requirement that GT & T complete its expansion plan. Prior links completion of the program to a rate increase that the PUC is unlikely to grant. GT & T already enjoys a rate of return on capital greater than the maximum that the PUC will allow. Great harm will befall the company, because (1) the PUC in Guyana can fine ATN/GT & T between $15 million and $20 million for not completing the expansion program and still specify that GT & T complete the plan within a specified time, with GT & T bearing all costs of completion or (2) the private financier of GT & T that holds a mortgage on GT & T can take over GT & T for a period of time and later sell the company. Since its inception, one of ATN's primary goals has been growth through acquisition of other companies within the telecommunications industry. Furthermore, imposition of a fine by the PUC for failure to complete the expan-

sion plan that ATN agreed to in its contract with the Guyanese government will have a negative effect on ATN's ability to make future acquisitions in other developing countries. Moreover, ATN will suffer a loss of good will.[9]

## II. THE LEGAL STANDARD

■ The trial court may in its discretion grant or deny a preliminary injunction. *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3d Cir.1976). The court uses its equitable discretion and must strike a fine balance between the factors that the court must analyze in arriving at its decision to grant or deny injunctive relief. The court must examine the following four factors:

(1) the moving party must show a likelihood of success on the merits;

(2) the moving party must produce evidence sufficient to convince the court that in the absence of the relief he will suffer irreparable injury;

(3) that granting the relief will not result in greater harm to the non-moving party; and

(4) that granting the relief will be in the public interest.

*Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648 (1985); *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987); *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir. 1985); *Olmeda v. Schneider*, 889 F.Supp. 228, 231 (D.V.I.1995). Each factor must be present. *ECRI*, 809 F.2d at 226. A strong showing of one factor, however, "may affect the necessary showing with regard to another." *Olmeda*, 889 F.Supp. at 231 (citing *Marxe v. Jackson*, 833 F.2d 1121, 1128 (3d Cir.1987)).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

#### 1. Ten Person Exemption

Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), provides that

---

8. The PUC is the regulatory body charged with oversight of GT & T and its rate structure.

9. In addition to a general loss of goodwill, ATN faces a negative impact on its relationship with the Guyanese people caused by Prior's removal

of Sir Shridath Rampal, the only Guyanese on the ATN Board of Directors. Rampal is viewed by many Guyanese as a national hero. Many Guyanese consider Rampal's removal from the Board an affront.

one violates federal securities laws by using the mails or an instrumentality of interstate commerce to "solicit or to permit the use of his name to solicit any proxy or consent or authorization" regarding a security registered as required by law "in contravention of such rules and regulations as the Commission may prescribe."[10] An exemption to the proxy registration rules is found in Rule 14a–2(b)(2), which permits a person to solicit stockholders without having to comply with the full panoply of proxy registration rules "where the total number of persons solicited is not more than ten." 17 C.F.R. § 240.14a–2(b)(2).

■ A violation of proxy registration rules promulgated by the Commission is violation of section 14(a) for which a federal court may "grant all necessary remedial relief." *See Kaufman v. Cooper Cos., Inc.*, 719 F.Supp. 174, 178 (S.D.N.Y.1989) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964)). While a technical violation of a proxy rule may be insufficient in some cases to permit recovery, a violation that causes provable injury that undermines the purposes of the rule entitles a plaintiff to relief under section 14(a). *Ash v. GAF Corp.*, 723 F.2d 1090, 1093 (3d Cir. 1983). The *Ash* court stated that the alleged injury "must not result merely from a technical misadventure; it must undermine the purposes upon which the rule is based and actual damage must be susceptible to proof." *Id.* Moreover, the court noted that a causal relationship must exist between the violation of the rule and the injury that the plaintiff suffered.[11] *Id.* at 1092–93.

This Court must determine whether plaintiffs have a substantial likelihood of success on the merits of their claim that defendant Prior solicited more than ten persons in violation of Rule 14a–2(b)(2). Defendants contend that the injunctive relief requested by

plaintiffs is inappropriate where the violation of Rule 14a–2(b)(2) is a technical violation. Rule 14a–2(b)(2) is not devoid of meaning in the context of a so-called technical violation, where, in addition, the defendants' violation caused injury to plaintiffs and the violation thwarts the purpose of the rule. *See id.* at 1093.

■ In the case at bar, plaintiffs can show a substantial likelihood of success on the merits on their claim if they convince this Court that (1) Prior violated the ten person exemption rule, (2) plaintiffs have proved injury, and (3) a causal relationship exists between the violation of the rule and the injury suffered by plaintiffs. *See id.* at 1092–93.

There is a dearth of precedent discussing the method of calculating whether not more than ten persons were solicited. To buttress their arguments regarding counting methodology, defendants primarily rely on two cases: *Bodlund v. First National Bank of Chicago*, 1985 WL 729 (N.D.Ill.1985), and a case that the *Bodlund* court relied on, *Water & Wall Assocs. v. American Consumer Industries*, 1973 WL 383 (D.N.J.1973). The *Water & Wall* court expressly stated that there was merit to the position that where "one person who controls several blocks of stock in different capacities is solicited, the interests that he represents should be counted for the purposes of the 'ten persons' provision of the rule." 1973 WL 383 at *8 (D.N.J. 1973). While noting that a stricter interpretation of the term "persons" also had merit, the court noted that no specific authority could be found for either argument. *Id.* The court ultimately decided that the person solicited in different capacities represented one person, basing its decision on what the court believed the meaning should be based on its views on the SEC's ability to articu-

---

**10.** The full text of section 14(a) states:
  It shall be unlawful for any person, by use of the mails or by any means of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or autho-

rization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.
  15 U.S.C. § 78n(a) (1988).

**11.** The rule violated in *Ash* was Rule 14a–3(b), which pertains to the mailing of an annual report along with or prior to the mailing of a proxy. *Ash,* 723 F.2d at 1092.

lately state a rule. *Id.* In *Bodlund,* the court determined that it had to count as one person a person who had "full power for his entire group of four." *Bodlund,* 1985 WL 729 at *3 (N.D.Ill.1985). Furthermore, the *Bodlund* court counted as one person solicited a partnership's representative who had "the sole power to vote the shares of the partnership." *Id.* at *2.

These cases are inapposite. They involve solicitation of persons who possessed the sole right to vote the shares solicited. In the instant case, Prior solicited persons who did not have sole voting rights. Rather, in almost every instance, the voting rights belonged to that person or entity and a closely affiliated person or entity.

■ In the case at bar, this Court counts as one person each person holding the voting rights to the ATN stock. Several of these voting entities represented more than one legal owner of the shares. The Court does not include those separate legal owners in its total. Rather, the person counted is the one that had the power to vote the shares. *See 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.,* 38 F.3d 211, 229 (5th Cir.1994) (citing *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1106–08, 111 S.Ct. 2749, 2765–67, 115 L.Ed.2d 929 (1991); *United Paperworkers Int'l Union v. International Paper Co.,* 985 F.2d 1190, 1198 (2d Cir.1993)). In sum, to correctly count the number of persons solicited, the person soliciting the shares must determine how many voting entities or persons actually hold the voting rights for the shares being solicited.

■ This Court cannot exclude from its total of persons solicited DFA Investment Dimensions Group, Inc., because the solicitation of Dimensional Fund Advisors, Inc. was also a solicitation of DFA Investment Dimensions Group, Inc. Regarding the ten-person exemption of Rule 14a–2(b)(2), "the significant factor is the number of persons solicited rather than the number who actually gave proxies." LOUIS LOSS, FUNDAMENTALS OF SECURITIES Regulation 458 (2d ed.1988). Defendants claim that Dimensional Fund Advis-

ors, Inc. did not respond to Prior's solicitation. Plaintiffs succeeded in determining that there was a second voting entity in the group to which Dimensional Fund Advisors, Inc. belonged. Prior could have made that same determination in order to correctly count the number of persons solicited.

In sum, Prior solicited each of the following persons with the power to vote ATN shares: (1) Capital Research & Management Co.; (2) Capital International, Inc.; (3) Dimensional Fund Advisors, Inc.; (4) DFA Investment Dimensions Group, Inc.; (5) Franklin Portfolio Associates; (6) Mellon Bank Corporation; (7) Detroit Police and Fireman's Association; (8) Kennedy Capital Management, Inc.; (9) G.T. Capital Management, Inc.; (10) Oppenheimer Management Corporation; (11) Tiedemann/McCabe Global Telecom Fund; and (12) Lewis Stern at the time that he was still the trustee of Prior's Charitable Reversionary Trust. These persons alone total twelve. In addition, one additional person should be added to the total. Prior's wife, Gertrude Jollock Prior, also owned ATN shares separately when Prior solicited her. Therefore, Prior solicited a total of at least thirteen persons.

■ Defendant Prior violated the federal securities laws by soliciting more than ten persons without complying with proxy registration requirements.[12] Defendants correctly note that plaintiffs bear the burden of showing that defendants solicited more than ten persons. Despite defendants' assertions to the contrary, the record supports a finding that plaintiffs have met that burden.

■ Plaintiffs proved injury. The injury to plaintiffs and ATN is ongoing and manyfold and includes: (1) a strained relationship between ATN and the Guyanese government over Prior's policies towards completion of an overdue expansion plan; (2) loss of good will; (3) possible loss of its GT & T subsidiary; (4) $15 to $20 million fine from the PUC in Guyana coupled with the required completion of the expansion plan; and (5) a negative

---

12. This Court declines to address the issue of whether Rule 14a–2(b)(2) applies at only the "seedbed" stage, *see Universal Container Corp. v. Slade,* 1971 WL 254, at *1 (S.D.N.Y.1971), or

throughout the proxy or consent solicitation process. Defendant Prior violated the rule, so it is irrelevant whether the rule applies throughout the process or at only the "seedbed" stage.

effect on future acquisitions in developing countries.

In the instant case, the violation of the ten person exemption is causally related to the injury sustained. The injury to plain-tiffs and ATN occurred because defendant Prior violated the rule that provides an exemption to the proxy registration rules. The instant case is unlike the case cited by defendants where a court determined that, in the context of an highly-contested public proxy fight, plaintiff made "no showing that anyone was misled by the alleged solicitation of the eleventh shareholder." *See Pantry Pride, Inc. v. Rooney,* 598 F.Supp. 891, 902 (S.D.N.Y.1984) (noting that there was "no hard evidence" that more than ten persons were solicited). The *Pantry Pride* court noted that "any defects in the original solicitation" were cured by a proxy statement, the amount of time that had passed since the solicitation, and "enormous discovery" in the case. *Id.* In the instant case, there was nothing done to cure the defects in the solicitation. No proxy fight ensued. By Prior not complying with the proxy registration rules, he was able to put himself and his designees in control, thereby causing the injuries adequately proved by plaintiffs. By being in power, he will stick to a plan of action that is directly at odds with the Guyanese government, thereby causing injury. Consequently, this Court concludes that there is a causal relationship between the injury and the violation of Rule 14a–2(b)(2).

This Court must examine the purposes of Rule 14a–2(b)(2) to determine whether the injury proved by the plaintiffs undermines the purposes of the rule or the section upon which the rule is based. *Ash,* 723 F.2d at 1094. Consequently, this Court must consider the purpose of section 14(a), because the rules flow from that section.

Section 14(a) is designed to " 'prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation.' " *Id.* at 1093 (quoting *J.I.*

*Case Co. v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964)). By enacting section 14(a), Congress intended to provide the opportunity for " 'fair corporate suffrage' " for shareholders of " 'every equity security bought on a public exchange.' " *Id.* (quoting *Borak,* 377 U.S. at 431, 84 S.Ct. at 1559).

This Court determines that Prior's actions undermined the purposes of the rule. Prior did not ensure fair corporate suffrage. Defendant Prior admitted that he did not tell Prosser about the private consent solicitation because he did not want Prosser to come up with his own plan or to try to do anything to stymie his efforts to remove Prosser and his designees from the Board. This evidence is damaging as it shows a desire to undermine the purpose of section 14(a). As early as April 1995, Prior began to take steps to solicit consents or pave the way for an ultimate solicitation. He knew about the proxy solicitation rules. He tried to come within the ten-person exemption so that Prosser could not get the chance to come up with a plan that could lead to a full-scale public proxy fight. Indeed, Prior admitted that he thought that it would be better to avoid an expensive, time-consuming public proxy contest. Prior tried to use the exemption so that he would not be forced into a proxy battle. The circumventing of the rules allowed Prior to get consents from voting entities representing, together with his shares, approximately 50.028% of ATN shares.

This Court concludes that plaintiffs proved a substantial likelihood of success on the merits on their ten person exemption claim.[13]

### 2. Material misstatements or omissions

The test for whether a statement or omission is material is whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *See TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96

---

13. Defendants submitted affidavits from Armour and McCabe that after reading plaintiffs memorandum of law in this case, their vote would not change. These affidavits alone are insufficient to persuade this Court that Armour's and McCabe's statements should be a ground for denying plaintiffs' motion.

S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). A reasonable shareholder must view an omitted fact "as having significantly altered the 'total mix' of information available." *Id.* at 449, 96 S.Ct. at 2132. Rule 14a–9 prohibits the making statements that are "false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a–9(a).

■ Plaintiffs allege that Prior made several material misstatements or omissions. Defendants claim either that the statements are true or that they failed to rise to the level of a misstatement, because they were "aspirational." Defendants assert that the information omitted was either not material or was in the public domain. This Court as a factual matter cannot find that the statements were material misstatements or that the omissions were material. The reasonable shareholder could read the statements as being "aspirational." The London Proposals were the subject of a press release put out by Prosser on behalf of ATN. This information was part of the "total mix" available to the stockholders. This Court concludes that plaintiffs failed to show a substantial likelihood of success on the merits regarding their material misstatements or omissions claim.

### 3. Smith's Research Note

■ The rules concerning solicitation of proxies or consents apply to communications which "constitute a step in a chain of communications designed ultimately" to convince a stockholder to "furnish, revoke or withhold proxies," or are a direct or indirect method of accomplishing the same result. *Long Island Lighting Co. v. Barbash,* 779 F.2d 793 (2d Cir.1985) (citing *Securities and Exchange Comm'n v. Okin,* 132 F.2d 784, 786 (2d Cir.1943)). A section 14(a) claim may be stated where a person solicits shareholders by making an effort to influence shareholder opinion by communicating certain information to the financial press and the greater financial community. *Trans World Corp. v. Odyssey Partners,* 561 F.Supp. 1315, 1320 (S.D.N.Y.1983).

■ The Court is faced with the issue of whether plaintiffs can show the substantial likelihood of success on the merits on the conditioning of the market claim. The Court does not consider this issue dispositive. Nonetheless, the Court finds that Smith's research note conditioned the market, and that this was a violation of securities laws.

Prior met with Smith, one of only three securities analysts who followed ATN's stock, knowing that the meeting could lead to the publishing of the information that he provided to Smith. Smith testified about the widely-known industry practice of publishing research notes following a meeting between an analyst and a top company official where the official disclosed material information to the analyst. Before the May 16, 1995, Prior engaged in activities that evidenced a desire to engage in an impending consent solicitation. Bringing the $4 million loss to Smith's attention, which led to that information being published, served to influence shareholder opinion. That was part of Prior's continuous plan that culminated with the July 25, 1995 filing of the consents. Plaintiffs have a substantial likelihood of success on the merits on this claim.

### B. Irreparable Injury

■ The party seeking a preliminary injunction as a remedy for a violation of federal securities law "must 'satisfy the traditional prerequisites of extraordinary equitable relief by establishing irreparable harm.'" *Gulf Corp. v. Mesa Petroleum, Co.,* 582 F.Supp. 1110, 1116 (D.Del.1984) (quoting *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 61, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12 (1974)). The requisite injury must be more than merely serious or substantial, and it must be of a peculiar nature, so that money cannot atone for it. *ECRI,* 809 F.2d at 226; *Naccarati v. Wilkins Twp.,* 846 F.Supp. 405, 408 (W.D.Pa. 1993).

■ This Court is convinced by the written record before it and the evidence adduced by plaintiffs at the preliminary injunction hearing that plaintiffs have made the necessary showing of irreparable injury. The loss of a business's good will is sufficient to support a finding of irreparable injury.

*Opticians Ass'n v. Independent Opticians,* 920 F.2d 187, 195 (1990). The dollar value of good will generally is difficult to calculate. *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991); *Basicomputer Corp. v. Scott,* 973 F.2d 507, 512 (6th Cir.1992). The loss of a subsidiary is difficult to measure, particularly when such loss would affect future acquisition opportunities. Indeed, even the fine contemplated by the PUC in Guyana and required completion of the plan will affect other aspects of ATN's business in a way that money cannot compensate. The filing of the government's complaint with the PUC is irreparable injury, because that filing affects the acquisition prospects in other developing countries. Consequently, this factor weighs in plaintiffs' favor.

### C. Balance of Hardship

 The court must weigh whether granting a preliminary injunction "would cause greater harm to the nonmoving party" than the harm caused to the moving party by not issuing the injunction. *Olmeda v. Schneider,* 889 F.Supp. 228, 233 (D.V.I.1995). In the instant case, defendants claim that ATN and its stockholders would suffer harm from the paralysis that would grip the ATN if this Court grants plaintiffs' request for a preliminary injunction. Defendants assert that the deadlock that plagued the company in the past would do so again. This Court is not persuaded that this is true. Furthermore, such an assertion by defendants is tantamount to admitting Prior's total inflexibility when it comes to making compromises that would lead ATN out of the purportedly deadlocked state.

Moreover, this Court discussed at great length the harm that plaintiffs suffer and will continue to suffer if this Court does not issue a preliminary injunction. These considerations tip the balance in favor of the plaintiffs regarding this factor.

### D. The Public Interest

 The final factor that the court must consider is the public interest. The ability of the preliminary injunction to further or hinder the public interest is a factor that the court must give considerable weight. *Olmeda v. Schneider,* 889 F.Supp. 228, 233 (D.V.I. 1995) (citing *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *United States v. Ingersoll–Rand Co.,* 320 F.2d 509 (3d Cir.1963)).

 In the instant case, the public has an interest in knowing that if a violation of the securities laws occurs, the courts will be willing, under the appropriate circumstances, to step forward and grant relief. This Court concludes that on the facts before it, the public interest would be furthered by providing a remedy for defendants' violation of the federal securities laws.

### IV. CONCLUSION

This Court in exercising its equitable discretion balances the four factors relevant to granting a preliminary injunction and concludes that a preliminary injunction must issue. Accordingly, for the foregoing reasons, plaintiffs' petition for a preliminary injunction is hereby granted. An appropriate order follows.