# THE VIRGIN ISLANDS TREE BOA (*Epicrates Monensis Granti*), ET AL., Plaintiffs

## v.

## JAMES LEE WITT, ET AL., Defendants

Civ. No. 1996/08

District Court of the Virgin Islands

Div. of St. Thomas and St. John

February 15, 1996

As Amended by Order Dated February 21, 1996

201

A. Jeffrey Weiss, Esq., Ann M. Rost, Esq., James Dougherty, Esq., A.J. Weiss & Associates, Julio A. Brady, Esq., Attorney General, Pamela Wood, Esq., Assistant Attorney General, Office of the Attorney General, Department of Justice, Lois E. Pilgrim, Esq., Virgin Islands Housing Authority, Stanley L. de Jongh, Esq., Assistant U.S. Attorney, Office of the U.S. Attorney, *for Plaintiffs*

Jordan S. Fried, Esq., David A. Trissel, Esq., *for Defendants*

Richard Austin, Esq., Supervising Attorney, Legal Services of the Virgin Islands, *for Intervenors*

FINCH, *Judge*

## MEMORANDUM OPINION

THIS MATTER comes before the Court on plaintiffs' motion for a preliminary injunction. Defendants opposed the motion. The parties filed a voluminous amount of documents with the Court including motions, memoranda of law, and associated exhibits.[1]

---

[1] Plaintiffs filed the following documents: Motion for Temporary Restraining Order, Memorandum of Law in support of that motion, Motion for Expedited Discovery, Supplemental Motion for Preliminary Injunction, Supplemental Memorandum of Law in support of that motion, Opposition to Emergency Motion for Order Increasing Bond, Motion to Amend Caption and Add and Drop Plaintiffs, Reply to Defendants' Opposition, Motion to Reopen, and Notice of Withdrawal.

The various defendants or intervenors filed the following documents: a Motion for Disqualification of District Court Judge, Motion to Strike, Motion to Deny Plaintiffs' Motion

The parties presented evidence and arguments to this Court from January 29 through January 31, 1995.

## I. INTRODUCTION

Plaintiffs in the above-captioned action seek to prevent continued construction of temporary emergency housing at Tract No. 1, Estate Nazareth ("the Estate Nazareth Project" or "the Project") on St. Thomas. Plaintiffs alleged that defendants committed various violations of federal and local laws, including environmental laws. For the reasons stated in this Opinion, this Court will deny plaintiffs' motion for a preliminary injunction.

## II. PROCEDURAL HISTORY

Plaintiffs filed both their Complaint and Motion for Temporary Restraining Order and Preliminary Injunction on January 19, 1996. On January 22, 1996, they amended the Complaint to correct the names of several defendants. From January 19 through February 12, 1996, the parties have filed numerous motions and memoranda of law with the Court.

On January 19, 1996, Chief Judge Thomas K. Moore of the District Court of the Virgin Islands, Division of St. Thomas and St. John, granted plaintiffs' motion for a temporary restraining order ("TRO"). Plaintiffs filed a $ 5000 bond as required by the TRO. Chief Judge Moore set a hearing on plaintiffs' motion for a preliminary injunction.

On January 23, 1996, plaintiffs filed a motion for expedited discovery. Chief Judge Moore held a hearing that same day on the motion, but reserved decision. All parties had not received a copy of the motion at the time of the hearing. On January 25, 1996, Judge

---

for Preliminary Injunction, Memorandum of Law in support of the Motion to Deny, Objection of Government Defendants to Entry of Preliminary Injunction, Motion for Increased Bond, Motion to Intervene, Memorandum of Law in support of that motion, Motion to Strike Plaintiffs' Supplemental Memorandum of Law, Motion in Limine to Exclude Proposed Witnesses, Motion to Dismiss, Amended Memorandum of Law, Memorandum of Law in Response to Plaintiffs' Reply to Defendants' Opposition, Opposition to Plaintiffs' Motion to Reopen, and Response to Plaintiffs' Notice of Withdrawal.

Moore recused himself from the case, with the case being assigned to Judge Raymond L. Finch in the Division of St. Croix.[2]

This Court held a hearing on the preliminary injunction from January 29, 1995 through January 31, 1995 at which the parties had the opportunity to present testimony and evidence. The parties have not yet commenced discovery.

## III. BACKGROUND AND FACTS[3]

### A. Parties and Intervenors

The 86 persons listed in the caption of both the Complaint and Amended Complaint as plaintiffs are residents and property owners of Estate Nazareth on St. Thomas or of the nearby portions of Estate Smith Bay.[4] Leading the list of plaintiffs in the caption is an additional plaintiff: the Virgin Islands Tree Boa (*Epicrates Monensis Granti*) ("the Tree Boa"). The Virgin Islands Tree Boa, also known as the St. Thomas Tree Boa, is a federally protected endangered species.

Defendants are the Director of the Federal Emergency Management Agency ("FEMA"), FEMA, the Director of the United States Fish and Wildlife Service ("USFWS"), the Governor of the Virgin

---

[2] On January 24th, VIHA filed a Verified Motion for Disqualification of District Court Judge. (Def.'s Verified Mot.). Members of the community had begun to hotly debate the issues surrounding the construction of the Project and the instant litigation. (See Mem. and Order, January 25, 1996) (Moore, C.J.). Chief Judge Moore resides in an area in close proximity to the Project and plaintiffs. (*See id.*). While emphatically stating his "confidence in [his] ability to decide this case fairly and impartially," he recognized that "some members of the community" perceived that he was "identified with the interests of the plaintiffs." (*See id.*).

[3] This entire section comprises this Court's findings of fact. The Court permitted the parties to present evidence and testimony at the hearing on the motion for a preliminary injunction. Several facts are undisputed. Of those facts to which the parties presented varying versions, the facts presented here by the Court are those it found to be true based on the testimony and evidence that was before the Court. The facts are presented primarily in a chronological manner essential to understanding and analyzing the instant case. Only selected references are made to the transcript of the almost three-day hearing. The three volume long transcript consists of over 600 pages.

At this procedural posture, this Court recognizes that the complete administrative record may not be before the Court. Nonetheless, the administrative record as presented and all other testimony and evidence provide a sufficient basis for this Court to analyze plaintiffs' claims.

[4] Although the Complaint and Amended Complaint both state that plaintiffs are residents and property owners, one of the plaintiffs listed is the Eastwind Association. (*See Compl.; Am. Compl.*).

Islands, the Commissioner of the Virgin Islands Department of Planning and Natural Resources ("DPNR"), the Executive Director of the Virgin Islands Housing Authority ("VIHA"),[5] and VIHA. The Director of FEMA, the Director of USFWS, and FEMA comprise the "federal defendants." Intervenors are party defendants who are a group of persons displaced by Hurricane Marilyn who remain at emergency shelters almost five months after the hurricane.

*B. Hurricane Marilyn*

In mid-September 1995, Hurricane Marilyn struck the Virgin Islands, with St. Thomas bearing the brunt of the hurricane's fury.[6] The hurricane caused extensive destruction of or damage to homes and other structures; loss of personal property; and widespread disruption of public utilities.

At the request of Governor Roy L. Schneider, the President of the United States declared the Virgin Islands a disaster area. The President had authority to issue such declarations pursuant to Section 401 of the Robert T. Stafford Relief and Emergency Assistance Act, 42 U.S.C. § 5170 (1988).

In the aftermath of the hurricane, many residents of St. Thomas were homeless or faced the prospect of living in their damaged or unsafe homes. A great need for emergency shelters existed. Many residents moved into emergency shelters. For some shelter inhabitants, living conditions were less than desirable, with some complaining of unsanitary conditions, lack of privacy, and other health or social-related problems.[7]

Some persons displaced by Hurricane Marilyn continue to live at an emergency shelter almost five months after the hurricane. Others, residing in the heavily-damaged Warren E. Brown public

---

[5] Plaintiffs refer to Conrad Francois as the Commissioner of the Virgin Islands Housing Authority. Mr. Francois is the Executive Director of VIHA and serves as its Chief Executive Officer. (*See* Tr. Vol. 2 at 159). Therefore, this Court will refer to him as Executive Director.

[6] While Hurricane Marilyn caused more extensive damage on St. Thomas, sections of St. Croix and St. John received substantial damage from the hurricane.

[7] Several intervenors testified regarding the conditions at the shelters and their desire to leave the emergency shelter at which they resided since the hurricane. (Tr. Vol. 3 at 4-17).

housing community on St. Thomas or in privately-owned homes, remained in their damaged or officially condemned homes. Motivating factors included the lack of alternative dwellings in which to live or fear for the safety of personal property that displaced persons moving to shelters would be forced to leave behind because of policies at the shelters.

## C. *The Project*

The temporary emergency housing being constructed at Estate Nazareth consists of prefabricated buildings on concrete footings. A "maximum of 56 multifamily buildings" will be built. (Pls.' Ex. 1 at 2-2). VIHA will use gravel to mitigate possible runoff of water by allowing for percolation of water into the soil, thereby decreasing runoff into the nearby waters of Vessup Bay. Walkways and roads will be covered with gravel. The buildings will have prefabricated concrete slabs. Unlike the shelter where displaced persons currently reside in an open area with no kitchen and with portable bathrooms, the apartments at the Estate Nazareth Project site will have bedrooms, a kitchenette, and bathroom facilities. (Tr. Vol. 1 at 181).

The Estate Nazareth Project is a to be a temporary one.[8] VIHA plans to dismantle the prefabricated buildings for future use elsewhere. The number of buildings and people living on the site will decrease as VIHA repairs the permanent housing to which most of the people living at the Estate Nazareth Project will be moved. (*See* Pls.' Ex. 1 at 3-8; Tr. Vol. 2 at 175-76). A rapid decrease

---

[8] One overriding concern of plaintiffs that repeatedly surfaced since VIHA first proposed the project was whether the project would be temporary. Some of the public comments received by FEMA bore out this fear that plaintiffs have concerning how long the temporary housing will remain on the site.

This Court fails to be persuaded by plaintiffs' allegations that the temporary housing will not be temporary. Plaintiffs base their allegations, in part, on a change in the footings from wooden footings in the original plans to concrete footings. VIHA made the change to conform to a post Hurricane-Marilyn change in the local building code. (See Tr. Vol. 2 at 191-92, 208). This modification standing alone fails to indicate to this Court that the temporary emergency housing will be anything other than temporary. Defendants presented testimony that concurs with this understanding (*Id.* at 208). Plaintiffs further based their allegations that the Project will not be temporary on plaintiffs' interpretation of statements attributed to the Governor of the Virgin Islands and the status of housing placed within the Virgin Islands six years ago following Hurricane Hugo.

would occur over the first six months. The site will be replanted and natural reforestation will take place to restore the trees.

### D. The Environmental Assessment

VIHA runs the Warren E. Brown public housing community and several others. Several of its housing communities received extensive damage from Hurricane Marilyn, and some buildings had to be condemned. Following Hurricane Marilyn, VIHA formulated a plan to create temporary emergency housing for residents displaced by the hurricane.[9] After reviewing various alternatives, VIHA developed plans for constructing prefabricated temporary emergency housing sufficient in number to accommodate the approximately 550 people that it identified needed to be transferred from damaged or unsafe homes or from emergency shelters. The proposed temporary emergency housing would accommodate public housing residents and some displaced persons from privately-owned homes. (Tr. Vol. 2 at 181).

VIHA reviewed several sites on St. Thomas for the proposed temporary emergency housing, rejecting all but two sites as unsuitable. The VIHA Executive Director testified that VIHA considered other alternatives, but sites at Estate Ross and Estate Nazareth were the only "practical" sites on which to rapidly construct the needed temporary emergency housing. (Tr. Vol. 2 at 167).

The two sites that VIHA selected were a one-acre site at Estate Ross in Charlotte Amalie and 8.5 acres of a site at Estate Nazareth that is the subject of the instant litigation.[10] VIHA intended to use the temporary emergency housing for the approximately six months that it estimated it would take to repair the approximately 149 VIHA permanent public housing units damaged by the hurricane. (Pls. Ex. 1 at 1-2, 2-3, 2-4).

---

[9] Conrad Francois, the Executive Director of VIHA, testified that in early October 1995 VIHA formulated its first plan for emergency shelters in which it indicated that temporary emergency housing would be built. (*See* Ex. D3-F). The plan gave an indication of some of the alternatives that VIHA considered. (*See id.*).

[10] The temporary emergency housing currently under construction at Estate Ross is not the subject of the instant litigation. Construction continues at that one-acre site on temporary emergency housing that will be used to temporarily house elderly and disabled persons.

VIHA received approval to proceed from FEMA, the federal agency that would provide funding for the temporary emergency housing project ("the Estate Nazareth Project"). VIHA selected a winning bid following an expedited bidding process. It permitted design modifications to be made to conform to the structures that the winning bidder proposed to construct.

FEMA prepared a Final Environmental Assessment report ("the EA") for the Estate Nazareth Project, issuing that report on November 16, 1995.[11] (Pls.' Ex. 1). FEMA did so despite its understanding that the National Environmental Policy Act ("NEPA") contained a statutory exclusion for the action FEMA planned to take with regards to the Estate Nazareth Project. (Tr. Vol. 2 at 43). Moreover, FEMA issued a Finding of No Significant Impact ("FONSI") on that same date. FEMA determined that the mitigation measures provided for in the EA would "compensate" for any significant environmental impacts that might occur. (Tr. Vol. 2 at 44).

During the time that FEMA was preparing the EA, it conducted an analysis of various factors relating to any effects the proposed Project might have on the environment. FEMA officials involved in the preparation of the EA met with officials from various agencies, including USFWS and local Department of Planning and Natural Resource's Division of Fish and Wildlife ("DFW"). (Tr. Vol. 2 at 31).[12]

FEMA, in consultation with USFWS and DFW, examined whether any issues existed relating to the Endangered Species Act. (Tr. Vol. 2 at 31). The agencies identified the Tree Boa as being an endangered species that might potentially be found at the Project site. (Tr. Vol. 2 at 32; See Pls.' Ex. 1 at 3-3).

FEMA's environmental analysis included a Section 7 Consultation[13] regarding the Tree Boa with USFWS pursuant to ESA. (Pls.'

---

[11] The EA is 78 pages long, including appendices, tables and figures.

[12] FEMA presented testimony from its expert witness Dr. William P. Magdych regarding the analysis done by FEMA in preparing the EA for the Estate Nazareth Project. Dr. Magdych participated in the preparation of the EA. (Tr. Vol. 2 at 16). In addition, he "served as an environmental liaison to the [FEMA] field coordinating officer." (Id.)

[13] Section 7 Consultation refers to the consultation required by Section 7 of the Endangered Species Act, Pub. L. No. 93-205 (codified as amended at 16 U.S.C. § 1536 (1973)).

Ex. 1 at 3-5; Tr. Vol. 2 at 33). The consultation consisted of telephone discussions and an exchange of correspondence. (Tr. Vol. 2 at 33-35, 93-95). A USFWS biologist analyzed the proposal for any possible effects that the Project might have on the Tree Boa. (Tr. Vol. 2 at 94). USFWS issued its recommendation to FEMA, which included mitigation measures. (*Id.*). Based on its findings, USFWS determined a more involved level of consultation was unnecessary. (Tr. Vol. at 95-96).

As part of its analysis, FEMA considered that the known habitat of the Tree Boa included the Estate Nazareth Project site. It, however, presented mitigation measures that would avoid significant harm to the Tree Boa. The measures included hand-clearing of brush prior to operation of heavy machinery on the site and collection of any snakes found. (*See* Tr. Vol. 2 at 33). The procedure of looking for the Tree Boa would involve examining the refugia of these primarily nocturnal snakes. (*See id.*). The refugia are rock or debris piles or termites' nests where the Tree Boa take refuge primarily during the day. (Tr. Vol. 1 at 94-95). If any Tree Boa were found, they would be turned over to the local DFW. (Tr. Vol. 2 at 33). Furthermore, FEMA's EA called for restoration of the Tree Boa habitat following dismantling of the Project. (Tr. Vol. 2 at 35). The mitigation measures were developed in consultation with USFWS and the local DFW. (Pls.' Ex. 1 at 3-5; Tr. Vol. 2 at 32-35). Similar measures were implemented in the past when a nearby site, the St. Thomas Swimming Association site, was cleared.[14] That area was also within the known habitat of the Tree Boa. An EA had been previously prepared for the Swimming Association site.

The site of the Estate Nazareth Project is "located in the 100-year floodplain." (Pls.' Ex. 1 at 3-8). Accordingly, as part of its analysis, FEMA also "considered the sensitivity of Vessup Bay." (Tr. Vol. 2 at 32). Vessup Bay is situated near the Estate Nazareth Project and collects runoff from surrounding areas.[15] (Pls. Ex. 1 at 3-3).

FEMA complied with an eight-step process recommended by a Presidential Executive Order regarding floodplain management.

---

[14]The clearing of the St. Thomas Swimming Association site took place more than six months ago using a mitigation plan similar to the one proposed for the Estate Nazareth Project. (*See* Tr. Vol. 1 at 32).

[15]The EA states:

(Pls. Ex. 1 at 3-7 to 3-12). FEMA adequately considered the Project site's status as a floodplain and took adequate measures to minimize potential effects.

Based on both the information provided to FEMA by other regulatory agencies and its own "understanding of the project and feasibility of implementing things like sediment controls and so forth, [FEMA] determined that it was unlikely to have any adverse effects on the bay." (Tr. Vol. 2 at 32). FEMA's understanding was reinforced by EAs prepared in the past for two nearby sites. The National Guard constructed an armory on one site. The other site is the site of a proposed facility for the St. Thomas Swimming Association. A large hole exists on the St. Thomas Swimming Association site, presumably for the eventual construction of a large swimming pool. (Tr. Vol. 1 at 175).

Following its environmental analysis of the possible effect of runoff from the project site, FEMA concluded that it expected no significant increase. (Pls.' Ex 1 at 3-4). FEMA considered that no "adverse impacts on the marine environment in Vessup Bay" were expected because of a combination of mitigation measures and dry conditions common during the time of the year that the Project was to exist. (*Id.*). Mitigation measures included placing the buildings on "prefabricated pads that rest on a porous gravel base" and not paving driveways and walkways. (*Id.*).

FEMA considered alternatives to the Estate Nazareth Project. FEMA rejected the No-Action Alternative as posing a "likely extreme risk to human health and safety" for the displaced victims of Hurricane Marilyn, many of whom were living in shelters or damaged or condemned homes. (Pls.' Ex. 1 at 2-2). Alternative structures such as "tent cities" and travel trailers were dismissed as posing health and safety risks. (Pls.' Ex. 1 at 2-4).

■ In the EA, FEMA discussed two alternative sites that proved to be unsuitable; the Hospital Site and the Bovoni site. (Pls.' Ex. 1

---

The project study area drains toward Vessup Bay, which begins offsite at the southeast side of the road beyond the sewage treatment plant parcel. This upper portion of the bay supports mangrove swamp, with open water a short distance from the road. Vessup Bay is considered to be a sensitive habitat and is included herein because drainage from the project study area leads directly to the bay.

(Pls.' Ex. 1 at 3-3, 3-4)

at 2-5). FEMA officials "drove around the island looking for sites" and "received input from numerous FEMA personnel who had done numerous helicopter flights" over St. Thomas. (Tr. Vol. 2 at 26). The EA contained a brief summary, rather than an exhaustive list, of the alternative sites that FEMA examined and rejected with the assistance of VIHA. (*Id.*). This Court credits the testimony that FEMA, with the assistance of VIHA, properly concluded that no alternative sites were available.[16]

To further complete the EA preparation process, FEMA solicited public comment while it was preparing the EA. The gathering of public comments was made difficult by the lack of telephones and electric power in the months following the hurricane. FEMA provided notice to the public via newspaper and radio advertisements. (Tr. Vol. 2 at 44). In addition, it had a five-day period of telephone comment solicitation, which it later extended. (*Id.*). Some comments were gathered by visiting low-income residents who FEMA concluded had not had the opportunity to provide adequate input. (*Id.*). FEMA received more than 157 comments primarily concerning the Estate Nazareth Project. (Pls.' Ex. 1 at 2-6). Furthermore, FEMA had handbills posted in the area surrounding the Estate Nazareth Project as an additional means of providing notice to the public. (Tr. Vol. 2 at 44). This Court finds that proper notice was given and those who desired an opportunity to be heard were given that opportunity.

FEMA adequately considered other factors such as socioeconomics. (See Pls.' Ex. 1 at 3-17 to 3-23). Part of this step of the process relied on examining public comments. FEMA based its assumption that the Project is temporary in nature on assurances to that effect provided by VIHA. (Pls.' Ex. 1 at 3-21).

Shortly after Hurricane Marilyn struck, Governor Roy L. Schneider declared a state of emergency for the Virgin Islands. On November 16, 1995, he issued Executive Order No. 365-1995. The Executive Order stated that the Governor had authority "to suspend temporarily or modify any public health, safety, zoning,

---

[16] Plaintiffs presented testimony that other sites existed that were not on a flood plain or within the known range of the Tree Boa. (Tr. Vol. 1 at 226-41). The contract architect for VIHA testified about alternative sites having been considered and rejected. (Tr. Vol. 2 at 218-221). The VIHA Executive Director presented similar testimony. (Tr. Vol. 2 at 167).

211

transportation or other requirements of law or regulation within this Territory" where he "deemed it necessary to invoke said authority for the provisions of temporary housing for the victims of Hurricane Marilyn." Exec. Order No. 365-1995 (citing V.I. CODE ANN. tit. 23, § 1132(a)(3) (1993)). Further, citing authority pursuant to V.I. CODE ANN. tit.23, § 1125(f) (1993) and the Revised Organic Act of 1954, § 3, as amended, 48 U.S.C. § 1561 (1988), the Governor ordered the suspension or modification of certain local laws[17] in order to permit construction of temporary housing for persons displaced by Hurricane Marilyn. Exec. Order No. 365-1995. Three sections of the Executive Order suspended certain provisions of local laws for twelve months.

Janice Hodge, a DPNR official, reviewed the EA prior to making a recommendation to the Director of Permits regarding the major coastal zone permit application submitted by VIHA for the Estate Nazareth Project. (*See* Tr. Vol. 2 at 136). Hodge is the DPNR official responsible for inspecting construction sites for compliance with coastal zone permit conditions regarding "non point source pollu-

---

[17] The Executive Order stated, in part, that the Governor ordered:

Section 1. The temporary suspension and/or modification as appropriate of any zoning, requirements of law or regulation within this territory essential for the provision of temporary housing for the victims of Hurricane Marilyn with respect to Parcel No. 2C Estate Ross, No. 8 New Quarters, St. Thomas — one (1) acre, and Track No. 1 Estate Nazareth Red Hook Quarter St. Thomas eight (8) acres.

Section 2. The provisions under Title 12 V.I.C. § 910 (d)(2) and (3), which relate to notice and comment periods and public hearings are suspended with respect to the development of temporary emergency housing.

Section 3. The provisions under Title 29 V.I.C. Act § 288 which relate to permitted uses are suspended for a period of twelve (12) months with respect to development of temporary emergency housing.

Section 4. The development provisions under Title 29 V.I.C. § 229 are suspended for a period of twelve (12) months with respect to the development of temporary emergency housing.

Section 5. Nothing in the Executive Order may be construed as contravening the goals established by Section 903 and the policies and standards of Section 906 and other permit requirements of § 910 of the Coastal Zone Management Act.

Section 6. The Provisions of 1981 Sessions Laws Act No. 4635 § 14 are suspended for a period of twelve (12) months with respect to the development of temporary emergency housing.

Exec. Order No. 365-1995.

tion abatement." (Tr. Vol. 2 at 134). She recommended careful monitoring of the Estate Nazareth Project to ensure compliance with the mitigation measures presented in the EA. (*Id.*).

On December 4, 1995, the Division of Coastal Zone Management of the Department of Planning and Natural Resources issued a major coastal zone permit to VIHA for the construction of the Estate Nazareth Project. Work at the Estate Nazareth Project site commenced. The site was cleared in the manner designated by the Tree Boa mitigation measures provided for in the EA. No Tree Boas were found, despite teams spending over eleven hundred hours searching for the Tree Boa and their refugia. (Tr. Vol. 2 at 215-16, 225).

In early January 1996, Hodge, the DPNR official, inspected the site for compliance with the mitigation measures. She found certain mitigation measures in place, i.e. a vegetable berm, a dirt berm, and a swale.[18] (Tr. Vol. 2 at 137). She recommended additional measures such as placement of gravel at the entrance of the construction site, placement of silt fences, and construction of a swale. (*Id.*). The swale would be placed in such a manner as to divert runoff from traveling across the cleared area of the Estate Nazareth Project site. (Tr. Vol. 2 at 140-41).

The placement of silt fences took place. Those silt fences, however, were improperly placed. On January 12, 1996, Hodge made recommendations about the proper placement of the silt fences. (Tr. Vol. 2 at 142). During her January 15, 1996 site visit, she determined that her recommendations had been followed. (*Id.*). She made further recommendations regarding changes to the construction entrance in order to further minimize soil disruption and replanting of "indigenous vegetation" once construction of utility connections was completed. (Tr. Vol 2 at 143-44). VIHA planned to institute additional mitigation measures when the Court issued a TRO. (Tr. Vol. 2 at 214-15, 227).

■ Following rain showers on or about January 11, 1996, sediment began appearing in Vessup Bay. This Court finds that it

---

[18] VIHA later made a decision to remove some vegetation berms to protect the Tree Boa. (Tr. Vol. 2 at 211). VIHA took this action after a conflict arose between local agencies: one wanted to remove the berms due to concern for the safety of the Tree Boa and the other wanted the berms to remain as an erosion mitigation measure. (*Id.*).

cannot determine as a factual matter that the sediment-containing runoff came directly from the Estate Nazareth Project site, as alleged by plaintiffs.[19] After carefully weighing all of the evidence presented, this Court is compelled to conclude that plaintiffs presented insufficient evidence to prove the source of the sediment-laden runoff.

While some question remains about the adequacy of the mitigation measures as they existed in early January of this year, this Court finds sufficient the mitigation measures provided for in the EA and those instituted at the behest of an official from DPNR.

FEMA is providing 90% of the funding to the Government of the Virgin Islands for the Estate Nazareth temporary housing, with the local government providing the remaining 10% of the funds. FEMA is providing the funds for six months pursuant to a Damage Assessment Report, with a possible extension for an additional twelve months.

To date concrete footings are in place for approximately six buildings. (Tr. Vol. 2. at 178). Approximately one million dollars has been expended and thirty-two percent of the work was completed when Chief Judge Moore issued the TRO. (Tr. Vol. 2 at 227).

---

[19] Both sides presented conflicting testimony regarding the source of the runoff. Plaintiffs' witnesses testified that an increase in sedimentation occurred in Vessup Bay as a direct result of the clearing of the Estate Nazareth Project site and the failure to institute adequate mitigation measures.

At the hearing, plaintiffs presented testimony and evidence that they contended showed that water traveling across the Estate Nazareth Project site in a sheet flow pattern carried soil from the site directly into Vessup Bay. (Tr. Vol. 1 at 38). They presented photographs entered into evidence that purported to show Vessup Bay shortly after Hurricane Marilyn and on or about January 11, 1996 after the location received approximately four inches of rainfall. Plaintiffs' expert witness, Dr. James Beets, testified that increased sedimentation could be seen in Vessup Bay in January when rain occurred after the Estate Nazareth Project site had been cleared compared to the days immediately following Hurricane Marilyn's passage. (Tr. Vol. 1 at 38-39).

Defendants presented testimony that mitigation measures prevented sediment from flowing from the Estate Nazareth Project into Vessup Bay. They presented testimony that the runoff came from off-site and passed in front of the Estate Nazareth Project site. (*See, e.g.,* Tr. Vol. 2 at 153; 212). In addition, defendants presented testimony that this Court finds credible regarding the existence of a pre-existing dirt road adjacent to the site across which water flowed before reaching a swale. An additional non-Project source of runoff was the adjacent St. Thomas Swimming Association site that contains a large hole in the site presumably for a future swimming pool.

## E. The Tree Boa

According to Dr. Peter Tolson, a leading expert in the Tree Boa and its habitat, the St. Thomas Tree Boa is a "unique subpopulation." (Tr. Vol. 1 at 69). The Tree Boa population may number less than 500 individuals. (Tr. Vol. 1 at 70). Dr. Tolson testified as an expert witness for plaintiffs at the hearing.

■ In the past, people have sighted Tree Boas on the eastern end of St. Thomas, with some sightings occurring in the general vicinity of the Estate Nazareth Project site. (Tr. Vol. 1 at 118).[20] Many of the Tree Boa specimens that people brought to DFW in the past were dead, having been killed by cars or directly by humans. (Tr. Vol. 1 at 121). Animal predators also kill Tree Boas. (Tr. Vol. 1 at 72-75). Weighing all of the evidence presented, this Court finds that the Estate Nazareth Project and its residents pose an insignificant risk to the Tree Boa.[21] People already living nearby, cars traveling through the area, and animals pose enough threat that the temporary addition of at most 550 people living in the area poses no significant increase in the dangers already facing the Tree Boa.

■ ■ Defendants elicited testimony from Dr. William Tolson, plaintiffs' expert on the Tree Boa and its habitat, that 1987 was the last time he saw a Tree Boa in the vicinity of the Estate Nazareth Project site, despite having looked for it in 1991 while conducting an "onsite Tree Boa study" at the Nazareth Site. (Tr. Vol. 1 at 88-89).[22] This Court cannot as a factual matter find that Tree Boas still actually exist at the 8.5 acre site of the Estate Nazareth Project.

---

[20] Ralf Boulon, the endangered species coordinator for DFW, testified that approximately 34 sightings were reported. (Tr. Vol. 1 at 118). The time period of those sightings was the approximately fifteen years that Boulon worked for DFW. Some of the sightings were word-of-mouth, i.e., the person making the alleged sighting did not bring the snake to DFW. (Tr. Vol. 1 at 119). Boulon testified that they accepted the validity of the sighting "depending on the person reporting them." (*Id.*). He estimated that over half of the sightings occurred within approximately one mile of the Estate Nazareth Project site. (*Id.* ).

[21] Dr. Tolson testified that the Estate Nazareth Project will jeopardize the continued existence of the Tree Boa. (Tr. Vol. 1 at 71). He disagreed with FEMA's evaluation of the risk to the Tree Boa, the quality of the habitat existing at the Project site prior to the clearing of the site, and the effectiveness of mitigation measures.

[22] Dr. Tolson testified that his familiarity with the site was based on "having worked in the Virgin Islands for over ten years." (Tr. Vol. 1 at 71). He further testified at the hearing that the last sighting of a Tree Boa of which he was aware was in Fall 1995 before

After careful consideration of the evidence, this Court finds the mitigation measures for the Tree Boa and its habitat to be adequate to lessen to an insignificant level the potential effects of the Project on the Tree Boa and its habitat. This Court credits testimony that tends to show that there may not be any Tree Boas at the Estate Nazareth Project site and that sufficient habitat remains in the adjacent areas upon which any possibly existing Tree Boas may live.

### F. Lack of Notice

Counsel to plaintiffs wrote letters dated November 3, 1995 to local government officials expressing concerns about the Estate Nazareth Project. No plaintiffs, however, wrote any letters notifying federal authorities of any alleged violations of federal laws.

## II. THE PARTIES' CONTENTIONS

### A. Plaintiffs' Claims

Plaintiffs presented nine claims in their 48-page amended complaint. The claims ranged from violations of federal laws including the National Environmental Policy Act ("NEPA"), the Water Pollution Control Act ("Clean Water Act" or "CWA"), the Endangered Species Act ("ESA"), and the National Flood Insurance Act. They further alleged violations of a number of Virgin Islands laws, including the zoning and land use laws, the Water Pollution Control Act, the Coastal Zone Management Act, and the act governing VIHA.

Plaintiffs claimed that defendant FEMA violated NEPA. Plaintiffs contended that the Project was a major federal action. They alleged that FEMA prepared an Environmental Assessment ("EA") instead of a more detailed Environmental Impact Statement ("EIS") that plaintiffs claimed that NEPA required for such major actions.

Plaintiffs alleged violations of ESA in their Second, Third, Fourth, Sixth, and Ninth Claims. Plaintiffs alleged that FEMA violated ESA by not performing its duties under that statute and regulations promulgated pursuant to ESA. In addition, plaintiffs

Hurricane Marilyn when he was told that someone captured a live tree boa. (Tr. Vol. 1 at 89).

claimed that USFWS and violated ESA by engaging in an informal, rather than formal consultation, regarding the Tree Boa. Moreover, they contended USFWS violated section 9 of ESA.

At the hearing, plaintiffs claimed that both the hawks bill and green turtles had been harmed by the sediment that plaintiffs alleged flowed directly from the Estate Nazareth Project site into Vessup Bay. Plaintiffs, however, failed to allege in their Complaint or Amended Complaint that any harm had occurred or would occur to either species of turtle or to sponges or grasses upon which the turtles feed.[23]

Plaintiffs' Seventh Claim and Ninth Claim alleged violations of both the federal and local Water Pollution Control Acts. During closing arguments at the hearing, plaintiffs withdrew their federal Clean Water Act claim.[24] In addition, plaintiffs presented speculative claims regarding construction of the Estate Nazareth Project leading to suspension of the National Flood Insurance Program on St. Thomas. (Am. Comp. ¶ 33).

Plaintiffs alleged various violations of Virgin Islands laws. One of plaintiffs' major contentions was the purported invalidity of Executive Order No. 365-1995. Plaintiffs contended that other Virgin Islands laws were violated due to an improper suspension of those laws for a period of time exceeding that permitted by law. Furthermore, plaintiffs alleged violations of their due process rights.

## B. Defendants' Responses to Plaintiffs' Claims

The federal defendants contended that (1) NEPA does not apply, so FEMA did not have to do an EIS; and (2) assuming, *arguendo*, that NEPA applied, FEMA complied with NEPA by doing an EA, issuing a FONSI, and determining that an EIS was not required. The federal defendants argued that plaintiffs lacked standing to bring the CWA and ESA claims, because plaintiffs failed to provide the required notice. Furthermore, they contended that the informal

---

[23] These claims are not properly before the Court. Consequently, the Court will do not a full analysis of these claims.

[24] Plaintiff presented scant evidence at the hearing regarding the issue of the effects of sewage on the environment as a result of the Estate Nazareth Project. Consequently, the Court will not discuss plaintiffs' claims that sewage output would violate the local Water Pollution Control Act. Moreover, the local statute fails to provide plaintiffs a private cause of action.

consultation conducted by USFWS met the requirements under ESA. They further contended that plaintiffs could not bring a NFIA claim.

Similarly, the Virgin Islands defendants argued that NFIA failed to provide a cause of action for plaintiffs. They contended that plaintiffs lacked standing to bring a NEPA claim. Moreover, their position was that NEPA did not apply to the local government. They concurred with the federal defendants that plaintiffs failed to meet the notice requirement of ESA. Claiming that plaintiffs lacked federal question jurisdiction, they contended that no supplemental jurisdiction existed for the Court to hear plaintiffs' Virgin Islands claims.

The Virgin Islands defendants also contended that plaintiffs failed to exhaust administrative remedies; consequently, the claims of violation of Virgin Islands laws were not properly before the Court. They argued that the local Board of Land Use Appeals ("BOLUA") was the proper forum. They premised their argument on the Executive Order No. 365-1995 having suspended specific zoning and land use related laws, without suspending the requirement that the forum for review of plaintiffs' claims would be the BOLUA. The Virgin Islands defendants further argued that the Governor, acting on behalf of the Government of the Virgin Islands, had authority to suspend or modify laws in the manner that he did in Executive Order No. 365-1995.

### III. OTHER MOTIONS

Several motions remain pending before the Court.[25] Plaintiffs filed a "Motion to Amend Caption and Add and Drop Plaintiffs." This motion will be denied.

Defendants filed a Motion to Dismiss plaintiffs' claims that alleged violations of both the Endangered Species Act and the Water Pollution Control Act arguing that proper notice was not filed.

---

[25] This Court made several rulings in open court during the hearing on the motion for preliminary injunction. The Court denied defendants' motion to increase the $ 5000 bond required by the Court when it issued the TRO. (Tr. Vol. 1 at 7). This Court also denied the following motions: (1) defendants' Motion to Strike Plaintiff's Supplemental Memorandum of Law and (2) defendants' Motion in Limine to Exclude Proposed Witness Testimony. (*Id.*).

Almost one week after the hearing, plaintiffs filed a Motion to Reopen the record of proceedings to present additional testimony and evidence. In addition, plaintiffs filed a Notice of Withdrawal of its alternative prayer for relief in its Amended Complaint.

## IV. THE LAW

### A. Preliminary Injunction Standard

■ As this Court recently stated, there are four factors that the Court must examine when exercising its discretionary power to grant or deny a preliminary injunction:

> (1) the moving party must show a likelihood of success on the merits;
>
> (2) the moving party must produce evidence sufficient to convince the court that in the absence of the relief he will suffer irreparable injury;
>
> (3) that granting the relief will not result in greater harm to the non-moving party; and
>
> (4) that granting the relief will be in the public interest.

*Crouch v. Prior*, 905 F. Supp. 248, 255 (D.V.I. 1995) (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 45 L. Ed. 2d 648, 95 S. Ct. 2561 (1985); *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987); *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir. 1985); *Olmeda v. Schneider*, 889 F. Supp. 228, 231 (D.V.I. 1995)).

### B. Standard of Review of Agency Decisions

■ The Third Circuit has declined to address definitively the standard of review for determining whether an agency was required to prepare an EA or EIS for a particular project. *See, e.g., Morris County Trust For Historic Preservation v. Pierce*, 714 F.2d 271, 278 n.5 (3d Cir. 1983); *Township of Lower Alloways Creek v. Public Serv. Elec. & Gas Co.*, 687 F.2d 732, 742 (3d Cir. 1982); *see also Public Interest Research Group v. Federal Highway Admin.*, 884 F. Supp. 876, 887-88 (D.N.J.), *aff'd*, 65 F.3d 163 (3d Cir. 1995).

Two possible standards of review exist. The first, the APA standard, permits courts to strike down an agency action that was

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act, 5 U.S.C. § 706 (1988). In contrast, the *Public Interest Research Group* court noted that the Third Circuit "has reserved decision on the question of standard review." 884 F. Supp. at 887. It concluded that it would use the "reasonableness standard" that the Third Circuit "repeatedly selected." *Id.* at 888. That test requires the agency decision to be "'reasonable under the circumstances' . . . when viewed 'in light of the mandatory requirements and high standards set by [NEPA].'" *Lower Alloways Creek,* 687 F.2d at 742 (citations omitted).

Courts generally give deference to the interpretation of a statute by an agency whose task it is to administer the statute. *Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 84 L. Ed. 2d 90, 105 S. Ct. 1102 (1985). Moreover, the interpretation given by an agency of its own regulation receives deferential treatment by the courts. *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 150, 113 L. Ed. 2d 117, 111 S. Ct. 1171 (1991).

### C. *Federal Constitution, Statutes, and Regulations*

The Fifth and Fourteenth Amendments of the Constitution of the United States and section 3 of the Revised Organic Act of 1954, as amended, provide due process guarantees. See U.S. CONST. AMEND. V; U.S. CONST. amend. XIV, § 1; 48 U.S.C. § 1561 (1988). The Administrative Procedure Act provides a right of review to aggrieved persons to seek relief in the courts. 5 U.S.C. § 702 (1988).

Congress enacted NEPA, in part, "to declare a national policy which will encourage productive and enjoyable harmony between man and his environment . . . [and] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321 (1988). NEPA created a procedural framework for infusing environmental concerns into the process by which agencies make decisions. *Morris County Trust for Historic Preservation v. Pierce,* 714 F.2d 271, 274 (3d Cir. 1983). Congress authorized the creation of the Council on Environmental Quality ("CEQ") to implement NEPA. 42 U.S.C. § 4342 (1988).

■ NEPA compels FEMA to produce an EIS if it undertakes a federal action that "significantly affects the quality of the human environment." 42 U.S.C. § 4332(C) (1988).[26] FEMA may make a preliminary determination of whether to produce an EIS by preparing an EA. *See Lower Alloways Creek*, 687 F.2d at 740. CEQ promulgated a regulation that provides guidance in deciding whether or not an agency prepared an adequate EA. *See* 40 C.F.R.

---

[26] CEQ regulations define "significantly" as follows:

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of the action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of the impact. Responsible officials must bear in mind that more than one agency may make decisions about particular aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects the public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27 (1995).

§ 1508.9 (1995). The regulation states:

"Environmental Assessment":

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with [NEPA] when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by § 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9 (1995). An agency must provide a court with "'convincing reasons why potential impacts are truly insignificant.'" *Lower Alloways Creek*, 687 F.2d at 741 (quoting *Maryland-National Capital Park & Planning Comm'n v. United States Postal Service*, 159 U.S. App. D.C. 158, 487 F.2d 1029, 1040 (D.C. Cir. 1973). Bald assertions that an action will have an insignificant environmental effect fail to satisfy NEPA requirements. *Id.*

Certain emergency actions taken pursuant to the Stafford Act "shall not be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of [NEPA]." 42 U.S.C. § 5159 (1988). One type of action falling within this exemption is a federal agency providing temporary emergency housing. *Id.* FEMA has promulgated a rule that provides guidance regarding whether it must complete an EA or EIS where the project involves providing temporary housing. *See* 44 C.F.R. §§ 10.8(c)(2)(vii)(J), 10.8(c)(3)(I) (1995).

ESA provides for protection and conservation of endangered species and the conservation of their habitats. 16 U.S.C. §§ 1531 to 1543 (1988 & Supp. V 1993). Congress mandated that federal

agencies fulfill their duty "to conserve endangered species and threatened species." 16 U.S.C. § 1531(c)(1). ESA prohibits an agency from taking an action that will "jeopardize the continued existence of any endangered or threatened species." 16 U.S.C. § 1536(a)(2) (1988).

If an agency plans to engage in an action that "may affect" an endangered or threatened species, that agency must consult with the Department of Interior's USFWS. 50 C.F.R. § 402.14(a) (1995). Agencies may engage in a process of informal, rather than formal, consultation. 50 C.F.R. § 402.13 (1995). That informal process involves discussion, including telephone conversations, and any correspondence between the two agencies regarding the matter for which consultation is sought. 50 C.F.R. § 402.02 (1995).

A plaintiff may bring a "citizen suit" under ESA if that plaintiff satisfies a 60-day notice requirement. 16 U.S.C. § 1540(g)(1)(A) (1988). The notice requirement under ESA is jurisdictional. *Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir. 1988).

The National Flood Insurance Act ("NFIA"), 42 U.S.C. § 4001 to 4129 (1988) provides for federal government participation in the providing of flood insurance. A further goal that Congress had in enacting a national flood insurance program was to provide for flood plain management. 42 U.S.C. § 4001.

Presidential Executive Order 11988 provides guidance to an agency regarding analyzing floodplain-related issues. *See* Exec. Order No. 11,988, 42 Fed. Reg. 26, 951 (1977).

### D. Virgin Islands Statutes

The Legislature of the Virgin Islands enacted laws designed to protect the environment and to ensure proper zoning and land use. The Legislature enacted an endangered species act to protect, conserve, and manage indigenous fish, wildlife and plants and endangered or threatened species." V.I. Code Ann. tit. 12, § 101 (Supp. 1995). The local zoning and land use laws have as a general purpose "promoting the health, safety, morals, and general welfare of the community." V.I. Code Ann. tit. 29, § 221 (1976). In addition, the VIHA may not approve a government housing project that lacks suitable recreation areas. *See* V.I. Code Ann. tit. 29, § 188

(1976). Like its federal counterpart, the Legislature of the Virgin Islands enacted a Water Pollution Control Act. V.I. CODE ANN. tit. 12, § 181 to 198 (1982 & Supp. 1995).

The Legislature of the Virgin Islands provided no private cause of action for either the local Water Pollution Control Act or the local endangered species act. Furthermore, plaintiffs cannot bring a cause of action under the section of the Code pertaining to VIHA that requires recreation areas to be built. The Act contains no private cause of action.

In addition to zoning and land use laws, the Legislature enacted the Coastal Zone Management Act, which regulates development in the coastal areas of the Virgin Islands. The Act established procedures to be used to grant a permit. V.I. CODE ANN. tit. 12, § 910 (1982 & Supp. 1995). Furthermore, the Act provided the process for appealing decisions regarding permits. V.I. CODE ANN. tit. 12, § 914 (1982); *see also LaValee Northside Civic Ass'n v. Virgin Islands Coastal Zone Management Comm'n*, 866 F.2d 616, 621 (3d Cir. 1989) (recognizing the requirement that a party "aggrieved by the granting or denial of an application for a coastal zone management permit must exhaust administrative remedies by appealing to the Board of Land Use Appeals prior to seeking redress in court).

## V. DISCUSSION

As a threshold matter this Court will discuss its ruling on motions taken under advisement at the hearing. In addition, other motions were filed after the hearing. This Court will discuss the motion to dismiss filed by the federal defendants after a discussion of the merits of plaintiffs' claims.

### A. Motion to Amend Caption and Drop or Add Plaintiffs

On January 29, 1996, the first day of the hearing on the motion for preliminary injunction, plaintiffs filed a Motion to Amend Caption and Add or Drop Plaintiffs. (Mot. Amend Caption). On that same day, plaintiffs filed their Reply to Defendants' Opposition. (Plfs.' Reply Defs.' Opp.)

In their reply, plaintiffs contended that they met the notice requirement for ESA citizen suits, based on a letter written by a person who was not listed as a plaintiff in either the Complaint or the Amended Complaint. (*Id.*). That person who sought to be

added as a plaintiff in the Motion to Amend Caption and Add or Drop Plaintiffs purportedly had written to the Secretary of Interior on November 12, 1995, thereby providing the required notice. (Mot. Amend Compl.).

In their Complaint and Amended Complaint, however, plaintiffs alleged that they satisfied the notice requirement by sending letters on November 3, 1995. No mention was made of any November 12, 1995 letter that allegedly satisfied the notice requirement until plaintiffs filed the motion to add or drop plaintiffs.[27]

■ This Court denies the Motion to Amend Caption and Add or Drop Plaintiffs. The Court's ruling from the bench denied the motion as untimely. (Tr. Vol. 3 at 23). Even were the motion timely, the interests of justice would not be served at this procedural posture by granting the motion. This Court will not permit plaintiffs to vary the composition of the persons listed as plaintiffs on the basis that someone's inadvertence caused a purported plaintiff to be left off the caption where the mandatory notice requirement would now be satisfied by a previously unmentioned letter written by this purported plaintiff.

*B. Motion to Reopen and Notice of Withdrawal*

■ On February 7, 1996, nearly one week after the last day of almost three-day hearing on the motion for a preliminary injunction, plaintiffs filed a Motion to Reopen the record of proceedings. In addition, they filed a Notice of Withdrawal seeking to withdraw their alternative prayer for relief stated in the Amended Complaint. Defendants filed an opposition to the Motion to Reopen, generally terming the additional testimony cumulative or prejudicial. Moreover, the Governor and the Commissioner of DPNR filed a response to the Notice of Withdrawal contending that justice would not be served by permitting plaintiffs to amend the Amended Complaint. (Defs.' Response Notice of Withdrawal).

This Court concurs with defendants' assessment and will deny the Motion to Reopen. Plaintiffs had sufficient time to adequately

---

[27] Even if the person seeking to be added as a plaintiff had inadvertently been left off the caption, this Court concludes that it is unlikely that no mention would be made of the November 12, 1995 letter that is so important to plaintiffs' allegations that they satisfied the notice requirement.

present evidence concerning its claims. The interests of justice will not be served by permitting additional testimony and evidence at this late juncture. This Court has received sufficient evidence from which to make its ruling regarding a preliminary injunction.

██ Moreover, the Court will not permit plaintiffs to amend the Amended Complaint by dropping its alternative prayer for relief. Federal Rule of Civil Procedure 15(a) provides that a court may grant a party leave to amend the party's pleading, with such leave to amend being "freely given when justice so requires." FED. R. CIV. P. 15(a). In addition, the party may amend the pleading if the opposing party consents in writing to the amendment. *Id*. The Notice of Withdrawal is opposed. Two local government defendants opposed the withdrawal of the alternative prayer for relief. Plaintiffs failed to indicate to this Court why, at this procedural posture, the Court should permit further amendment to plaintiffs' amended complaint to permit removal of the alternative prayer for relief. This Court concludes that the interests of justice will not be served by permitting further amendment of this nature. Therefore, this Court will not give plaintiffs leave to amend the Amended Complaint.

*C. Likelihood of Success on the Merits*

*1. Federal Claims*

*a. Adequacy of the Environmental Assessment*[28]

Assuming, *arguendo*, that NEPA applied to FEMA's actions regarding the Estate Nazareth Project, the EA complied with NEPA requirements. For the reasons more fully discussed below, this Court concludes that FEMA's actions satisfy the requirements of either the "arbitrary and capricious" standard of review, *see* 5 U.S.C. § 706, or the "reasonableness" standard repeatedly used by the *Third Circuit, see Lower Alloways Creek*, 687 F.2d at 742.

NEPA sets demanding standards for agencies to follow. Congress, through the enactment of NEPA, required FEMA "to take a

---

[28] While this discussion focuses primarily on the adequacy of FEMA's analysis of environmental concerns, this Court is mindful of the analysis of other factors such as traffic effects and socioeconomic concerns that FEMA considered in producing the EA. This Court finds the analysis of those factors by FEMA to be sufficient to satisfy NEPA and the relevant CEQ regulation regarding whether an action is "significant."

hard look at environmental consequences before taking a major action." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97, 76 L. Ed. 2d 437, 103 S. Ct. 2246 (1983). The standards, however, are not inflexible. Instead, various levels of inquiry exist. The initial inquiry that an agency makes is the preparation of an EA to determine whether the action contemplated is significant within the meaning of NEPA requirements. *See Lower Alloways Creek*, 687 F.2d at 741-42. If the agency determines that no significant impact exists, it need not proceed with further extensive studies required for preparing an EIS. *Id.* at 740.

FEMA satisfied the requirements of proving sufficient evidence in a concise document that discussed FEMA's analysis regarding its decision that its actions concerning the Project merited a FONSI instead of an EIS due to the insignificant effects of the Project.[29] *See Lower Alloways Creek*, 687 at 741.

The process of creating an EA does not entail as extensive investigation and analysis as an agency performs when it must produce an EIS. *See id.* at 740-41. The EA, however, must "briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9 (1995). In the EA, FEMA discussed the alternatives considered. It considered alternative sites for placement of the project. No other sites were available on which to rapidly construct the badly needed temporary emergency housing. FEMA disregarded as a viable option the placement of alternative structures such as "tent cities" and travel trailers due to the inherent safety and health risks. FEMA determined that it was imperative that it rapidly take action to safeguard the welfare of displaced persons. Consequently, it rejected the No-Action alternative.

FEMA examined possible environmental effects, and provided for mitigation of any possible effects on the environment. Evidence presented at the hearing indicates that considerable consideration was given to environmental issues that could potentially arise as a

---

[29] FEMA prepared an EA for the Estate Nazareth Project, despite its understanding that a statutory exception applied permitting it to forego preparation of an EA or EIS. The Court will discuss further the validity of FEMA's understanding regarding whether 42 U.S.C. § 5159 permitted FEMA to consider its actions regarding the Project as not being a major action.

result of the Estate Nazareth Project. Not only does the EA provide this evidence, but the testimony presented at the hearing indicated the great extent that FEMA considered the environmental issues, particularly given the urgent need for the Project. FEMA considered the possible effects on Vessup Bay and on the Tree Boa. FEMA considered the well-being of other species, as well. FEMA considered other factors such as traffic, sewage, and socioeconomic issues. It gave adequate consideration to floodplain issues, taking into account mitigation measures, the brief duration of the project, and the potential for rainfall during the time the Project would be in place.

 Moreover, FEMA provided adequate mitigation measures to lessen to an insignificant level any effects that the Project might have. An EIS need not be done "if a mitigation condition eliminates all significant environmental effects." *Norfolk v. United States Corp of Engineers*, 968 F.2d 1438, 1449 (1st Cir. 1992); *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 62 (4th Cir. 1991), *cert. denied*, 502 U.S. 1092, 117 L. Ed. 2d 411, 112 S. Ct. 1164 (1992). In the EA, FEMA provided for mitigation measures for preventing harm to the Tree Boa and Vessup Bay. FEMA held meetings and consultations to ensure the appropriateness of its course of action.

 The evidence presented convinces this Court that FEMA validly determined that the Estate Nazareth Project would have no significant impact on the environment if the guidelines established in the EA were followed. The statements made in FEMA's EA are not bald assertions. *See Lower Alloways Creek*, 687 F.2d at 741. An EA need not provide the level of detail that an EIS would provide. *See Don't Ruin Our Park v. Stone*, 802 F. Supp. 1239, 1247-48 (M.D. Pa. 1992). FEMA provided a sufficient level of detail to meet the requirements for an EA of providing evidence regarding FEMA's decision not to proceed with an EIS.

The EA was done at a time when a devastating hurricane had caused extensive damage, particularly to St. Thomas. Many people were homeless and living in dangerous or unsanitary conditions. The need existed for quick action that would meet all of the legal requirements involved in constructing the Estate Nazareth Project. Legitimate concerns existed regarding finding a suitable, govern-

ment-owned site to be used to rapidly construct the temporary emergency housing. The Estate Nazareth Project is a temporary project, with mitigation measures designed to return the environment to its original state. FEMA did not put improper emphasis on the temporary nature of the Project. *See Louisiana ex rel. Guste v. Lee*, 635 F. Supp. 1107, 1121 (E.D. La. 1986). FEMA weighed all of the relevant factors. In addition, FEMA provided proper notice to residents in the area, permitting them to make comments on the Project. At the start of this Project, neither FEMA nor VIHA would likely have viewed as "highly controversial" the Estate Nazareth Project designed to provide temporary emergency housing for victims of a devastating hurricane, while at the same time minimizing to an insignificant level any adverse effects on the environment or an endangered species. *See* 40 C.F.R. § 1508.27 (1995).

Plaintiffs contended that FEMA failed to consider properly CEQ regulations that FEMA must use to determine whether an action is significant. Such a determination would invoke the further requirement that the agency produce an EIS. The concept of significance comprises two separate inquiries: (1) the context and (2) the intensity. *See* 40 C.F.R. § 1508.27 (1995). The CEQ regulation in question provides an extensive list of ten factors to be considered when examining intensity. § 1508.27(b)(1)-(10). While this Court will not discuss these factors *in seriatim*, this Court's discussion throughout this Opinion makes it clear that this Court is convinced that the EA takes each factor into account. FEMA made its decision not to proceed with an EIS by examining these factors, albeit in a manner in which they may not have cited to the particular section of the *Code of Federal Regulations*.

■■ This Court will not find unreasonable under the circumstances FEMA's decision to do an EA instead of an EIS. "When specialists express conflicting views an agency must have discretion to rely on the reasonable opinions of its own experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 104 L. Ed. 2d 377, 109 S. Ct. 1851 (1989). Disagreement amongst experts fails to be a sufficient basis for reversing the determination of an agency not to proceed with an EIS. *Cf. Public Interest Research Group v. Federal Highway Administration*, 884 F.

Supp. 876, 891 (D.N.J.), *aff'd*, 65 F.3d 163 (3d Cir. 1995) (stating that two affidavits from plaintiffs' expert disagreeing with an agency determination was an insufficient basis for reversing an agency decision not to do an EIS or EA where the agency had done sufficient review).

The experts in the instant case disagreed on areas ranging from the effects of the project on the Tree Boa and its habitat to the effects on Vessup Bay. Plaintiffs' expert concluded that the Project jeopardizes the survival of the Tree Boa on St. Thomas. Defendants presented evidence that adequate mitigation measures are in place. Furthermore, the existence of any Tree Boas on the site is uncertain. This Court finds that based on the evidence presented to the Court, the last time one of the world's leading experts on the Tree Boa found one near the site of the Estate Nazareth Project was in 1987, despite having looked for them in 1991. He had not found any following Hurricane Marilyn. The Tree Boas are nocturnal and often the only visible signs of them during daylight hours are their refugia. Teams of people looked for those signs during the early stages of the construction process at the Estate Nazareth site. No one found any Tree Boas on the site. Likewise, their refugia were not found. Further, habitat remains in the nearby area to provide a place for the Tree Boa to live. A minimal increase in any threat to the Tree Boa will be created by the temporary small increase in the area's human population due to the Project.

■ Plaintiffs have not met their burden of showing that they have a likelihood of success on the merits regarding their claim that environmental harm to the marine environment directly resulted from the construction that was taking place at the Estate Nazareth Project site. Plaintiffs presented testimony and evidence concerning runoff that allegedly came from the Estate Nazareth Project site and flowed into Vessup Bay.

Defendants presented evidence that the runoff came from off site. Defendants pointed to mitigation measures at the site as lessening the possibility that runoff would flow over the site carrying soil into the nearby Vessup Bay. Defendants presented evidence that a dirt road on the site predated the inception of the Project. They suggested that runoff came from the road, as well as from a large hole in an adjacent site. This Court adopts the view

that plaintiffs failed to prove sufficiently that the Estate Nazareth Project was the source of any runoff that flowed into Vessup Bay after the rain occurred in January.

Plaintiffs cannot succeed on the merits of claims regarding the hawks bill turtle, the green sea turtle, or the sponges. Plaintiffs' Amended Complaint lacks the degree of specificity that would indicate that a specific claim is raised as to these species. While plaintiff presented evidence about the sensitivity of sea grass beds and turtle grass beds in Vessup Bay, the issue is not properly before this Court.

In sum, FEMA met the requirements of NEPA by preparing an adequate EA. *See* 40 C.F.R. § 1508.9 (1995). Despite plaintiffs' contentions, the EA needed only be a "concise public document" that "briefly provided sufficient evidence and analysis" regarding FEMA's decision that an EIS was unnecessary due to no significant impact to the environment. *See id.* Consequently, plaintiffs failed to meet their burden of showing a likelihood of success of the merits on their claim that FEMA's EA was inadequate.

### b. Did NEPA apply?

Plaintiffs contended that NEPA applied to the action taken by FEMA regarding the Estate Nazareth Project. FEMA contended that the Stafford Act made NEPA inapplicable to the action that FEMA took; consequently, there was no requirement that FEMA do either an EA or an EIS.

The Stafford Act provides, in pertinent part, that

> An action which is taken or assistance which is provided pursuant to section 5170a, 5170b, 5172, 5173, or 5192 of this title, including such assistance provided pursuant to the procedures provided for in section 5189 of this title, which has the effect of restoring a facility substantially to its condition prior to the disaster or emergency, shall not be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969. . . . Nothing in this section shall alter or affect the applicability of the National Environmental Policy Act of

231

1969 to other Federal actions taken under this chapter or under any other provision of law.

42 U.S.C. § 5159 (1988). FEMA recognized the existence of these "statutory exclusions" in its rule.[30] The FEMA rule provides that Stafford Act exclusions from the requirement of preparing an EA or an EIS are for the following actions:

> (i) Action taken or assistance provided under sections 305, 306 or 403 of the Disaster Relief Act of 1974, as amended, (Pub. L. 93-288); and
> (ii) Action taken or assistance provided under section 402 or 419 of the Disaster Relief Act of 1974, as amended, that has the effect of restoring facilities substantially as they existed prior to a major disaster or emergency.

44 C.F.R. § 10.8(c)(3) (1995). Using the new section numbers in the Stafford Act, the rule reflects an agency interpretation that a statutory exclusion exists for actions taken regarding FEMA providing temporary housing.

In another section of that rule, however, FEMA addresses categorical exclusions. Pursuant to CEQ regulations, FEMA provides for "categories of actions that have been determined by FEMA to have no significant effect on the human environment and are, therefore, categorically excluded from the preparation of [EIS]s

---

[30] While not a factor in the Court's analysis and ruling in the instant case, the Court notes that FEMA issued a final rule effective February 6, 1996 amending the rule that had existed when FEMA decided to proceed with funding the Project. The new rule clarifies FEMA's interpretation of the statutory exclusion provided by 42 U.S.C. § 5159. Regarding statutory exclusions under the Stafford act to NEPA requirements for an EA or EIS, FEMA's newly issued rule lists as statutory exclusions:

(1) Action taken or assistance provided under sections 403, 407, or 502 of the Stafford Act; and
(2) Action taken or assistance provided under section 406 of the Stafford Act that has the effect of restoring facilities substantially as they existed before a major disaster or emergency.

61 Fed. Reg. 4,227 (1996) (to be codified at 44 C.F.R. § 10.8). The new rule also addresses a categorical exclusion for temporary housing under section 408 of the Stafford Act. The rule, however, excludes "the following emergency and disaster response, recovery and hazard mitigation activities under the Stafford Act: . . . (D) Temporary Housing (§ 408), except locating multiple mobile homes or other readily fabricated dwellings on sites, other than private residences, not previously used for such purposes." *Id.*

and [EA]s." 44 C.F.R. § 10.8(c) (1995). An exception to one exclusion provides that an exclusion exists for

> [t]emporary housing, except for federally-funded development of or placement of mobile homes, travel trailers, or other readily fabricated dwellings on group sites. A group site consists of 25 or more units, unless located in a base floodplain, wetland, or other recognized high hazard area, in which case more than one unit on a site constitutes a group. A group site does not include more than one unit on a private site (§ 404).

44 C.F.R. § 10.8(c)(2)(vii)(J) (1995). FEMA provides no definition of "other readily fabricated dwellings." Prefabricated housing of the type to be used at the Estate Nazareth Project site likely falls into this category. Located on the site will be a "maximum of 56 multifamily buildings." (Pls.' Ex. 1 at 2-2). An apparent conflict exists between the statutory exclusion provided by the Stafford Act and the categorical exclusion regarding temporary housing of the "readily fabricated type." Congress created the statutory exclusion that FEMA interpreted as applying to temporary housing. The CEQ, which is created pursuant to NEPA, authorized FEMA to create categorical exclusions. Both types of exclusions address the same subject: whether an agency must do an EA or EIS prior to providing temporary emergency housing.

Generally, courts defer to the agency's interpretation of a statute that it administers. *Chemical Mfrs. Ass'n*, 470 U.S. at 125. Further, deference is given to an agency's interpretation of its rules. *Martin*, 499 U.S. at 150. If there was not an apparent internal conflict within FEMA's own rules this Court would not be hesitant to defer to FEMA's interpretation. This Court, however, cannot ignore the apparent conflict.

The federal defendants argued that the FEMA's decision not to prepare an EIS was made pursuant to the statutory categorical exclusion provided for in 42 U.S.C. § 5159. (*See* Fed. Defs.' Mem. of Law Resp. Plfs.' Reply Defs.' Opp. at 4-6). They contended that 44 C.F.R. § 10.8(c)(3)(2) (1995) provided further authority for their position. FEMA failed to offer an explanation for the apparent internal conflict. Plaintiffs held a contrary view and contended that

the action taken was a "major federal action" requiring a full-blown EIS.

■ This Court concludes that FEMA's decision to use the statutory exclusion rather than the more specific categorical exclusion addressing "readily fabricated dwellings on group sites" gives the appearance that FEMA failed to follow its own regulations. FEMA interpreted the statutory exclusion provided by 42 U.S.C. § 5159 as applying to its actions regarding the Estate Nazareth Project. One section of FEMA's own rule addresses such an exclusion for temporary housing. Another section of that same rule, however, addresses, more specifically, temporary housing of a category that likely includes the structures to be constructed at Estate Nazareth. That more specific rule would appear to require FEMA to engage in the panoply of activities involved in doing an EIS, including doing an EA to determine whether the more extensive EIS would be required.

FEMA offered no explanation to this Court why it would use its agency expertise to create a rule for "readily fabricated dwellings on group sites," yet not follow it for the Estate Nazareth Project. This Court admonishes FEMA for such a practice. The appearance of FEMA disregarding its own rule is not dispositive, however, in light of this Court's ruling that FEMA produced an adequate EA for the Estate Nazareth Project.

*c. ESA claims*

Similarly, plaintiffs failed to prove to this Court that they have a substantial likelihood of success on the merits on their ESA claims. A federal agency may not take an action that "jeopardize[s] the continued existence of any endangered or threatened species." 16 U.S.C. § 1536(a)(2). Under ESA, FEMA had to consult with the Department of Interior to determine whether the action poses a threat to the "continued existence of any endangered species." § 1536(a)(2).

Plaintiffs claimed that defendants Beattie and USFWS failed to comply with ESA, thereby causing irreparable harm to plaintiffs. FEMA conducted the required "Section 7" consultation with USFWS as required by § 1536(a)(2). 50 C.F.R. § 402.13 (1995). USFWS personnel reviewed the proposed Project and biological

information provided by FEMA concerning the Project. USFWS used that information to analyze the effects, if any, the Project would have on the Tree Boa. The previous section of this Opinion details many of the actions taken by FEMA regarding protecting the Tree Boa from harm. Both FEMA and USFWS acted responsibly in fulfilling their duties to safeguard the future of the Tree Boa. Once USFWS determined that FEMA's actions would not violate ESA, USFWS had to discuss the impact and any proposed mitigation efforts in its communication of its recommendation to FEMA. See § 1536(b)(4)(B). USFWS recommended mitigation measures in its letter to FEMA that concluded the only required level of consultation.

### d. Motion to Dismiss Claims Involving ESA Violations

Federal defendants filed a motion to dismiss claims relating to violations of ESA arguing that plaintiffs failed to provide the requisite notice to federal officials. To meet the notice requirement, plaintiffs had to notify federal officials of alleged violations of ESA. *See* 16 U.S.C. § 1540(g)(1)(A); *see also Save the Yaak Comm.*, 840 F.2d at 721. None of the plaintiffs provided written notice to any federal officials. Plaintiffs' counsel's letters to local officials expressing concern about the Project fail to meet ESA requirements. Even if plaintiffs could succeed on the merits of their ESA claim regarding the Tree Boa, which this Court determines plaintiffs cannot, this Court would have to dismiss plaintiffs' claims regarding ESA violations for failure to provide proper notice to the Secretary and the alleged violator.

### e. Other Federal Claims

Plaintiffs alleged in their Amended Complaint that FEMA violated its regulations regarding flood plain protection and wetlands (Am. Compl. ¶ 35-37). Plaintiffs failed to present adequate evidence regarding these violations. Moreover, Congress failed to provide a private right of action for plaintiffs' claims that FEMA purportedly violated flood plain regulations or that FEMA's actions somehow put the National Flood Insurance Program on St. Thomas in jeopardy of being suspended. *Cf. Arvai v. First Federal Savings & Loan Ass'n*, 698 F.2d 683, 684 (4th Cir. 1983) (per curiam)

(concluding that no private cause of action existed for borrowers to bring suit against lenders for failure to comply with NFIA requirements); *Segall v. Rapkin*, 875 F. Supp. 240, 241 (S.D.N.Y. 1995) (concluding that NFIA creates neither an express nor implied private cause of action for homeowners to sue government contractors for errors in the contractors' flood insurance studies).

### 2. Virgin Islands Claims

#### a. Governor's Executive Order

 The Executive Order issued by the Governor expired 60 days from the date of issuance. The Virgin Islands Code provides for a maximum 60-day time period for the Governor

> to suspend temporarily or modify . . . any public health, safety, zoning, transportation or other requirement of law or regulation within this Territory when by proclamation he deems such suspension or modification essential to provide temporary housing for victims of an emergency or major disaster.

V.I. CODE ANN. tit. 23, § 1132(a)(3) (1993). The Governor issued Executive Order No. 365-1995 on November 16, 1995. The Governor ordered the suspension or modification of various local laws to permit construction of the temporary emergency housing at two sites on St. Thomas for persons displaced by Hurricane Marilyn. Exec. Order No. 365-1995. The Executive Order, however, stated that twelve months was the period for which the suspension and or modification would extend. The Virgin Islands Code provides for sixty days and no more. Consequently, the Governor's Executive Order expired on January 15, 1996 by operation of section 1132(a)(3) of Title 23.

Plaintiffs argued that the Governor's provision for a twelve-month suspension or modification of the laws invalidated the Executive Order. (Pls.' Mem. of Law Supp. Mot. for Injunctive Relief at 6). Plaintiffs termed the Executive Order "excessive and unlawful" deeming it worthy of "being declared null and void" by the Court. (*Id.*).

 The actions of Virgin Islands defendants taken in regards to the Estate Nazareth Project did not violate Virgin Islands laws.

While the Governor may have incorrectly attempted to extend the date of effectiveness of the Executive Order, this Court determines that his act was not in violation of the law.

The Executive Order was in effect at the time VIHA received its major coastal zone permit. VIHA received its permit on December 4, 1995. That date was within the time frame that the Executive Order was valid, i.e., within 60 days from the date the Governor issued the Executive Order. The 60-day provision in the statute does not require that the construction of temporary housing be completed within 60 days or that the buildings must be constructed, lived in, and dismantled within 60 days. See V.I. CODE ANN. tit. 23, § 1132. Although the Executive Order expired within 60 days from date of issuance, any actions that defendants took that purportedly violated land use or zoning laws took place within that 60-day period in which the laws were not in effect.

In addition, plaintiffs sought to have this Court determine that Executive Order No. 365-1995 was "violative of plaintiffs' due process rights guaranteed under the Fifth and Fourteenth Amendments to the Constitution of the United States and [section] 3 of the Revised Organic Act of 1954." (Am. Compl. at 46). Plaintiffs, however, failed to present evidence that the Executive Order violated their rights in this manner. Plaintiffs failed to demonstrate that the legal suspension of a notice and comment period or public hearings relating to the proposed construction of the Estate Nazareth Project implicates any constitutional or Revised Organic Act claims. This Court concludes that plaintiffs failed to properly address this issue. Plaintiff presented insufficient argument and evidence upon which this Court may make a ruling. Consequently, the issue of alleged constitutional violations and violations of the Revised Organic Act of 1954 are not properly before the Court at this procedural posture.

*b. Failure to Exhaust Administrative Remedies*

██ ██ Plaintiffs failed to exhaust administrative remedies concerning their claims under the coastal zone management laws. Plaintiffs should have taken to the Board of Land Use Appeals any complaints they had regarding any harm they allegedly suffered due to the granting of a major coastal zone management permit to

VIHA for the Estate Nazareth Project. See V.I. Code Ann. tit. 12, § 914 (1982). Third Circuit jurisprudence dictates that

> Administrative appeal rights must be exhausted before seeking judicial relief where the grievance is based on the grant or denial of a coastal zone permit.

*LaVallee Northside Civic Ass'n*, 866 F.2d at 621.

### c. Other Virgin Islands Claims

Plaintiffs cannot succeed on the merits of their claim regarding the local Water Pollution Control Act. They failed to present adequate evidence to this Court that the Estate Nazareth Project will lead to increased pollution of the environment, specifically Vessup Bay.

 Plaintiffs lack standing to sue under either the local Endangered Species Act or the act that requires VIHA housing projects to have suitable recreation areas. Those statutes simply do not provide a private cause of action.

### d. Irreparable Harm

Plaintiffs failed to prove to this Court that they have suffered and will continue to suffer irreparable harm, which is a prerequisite for this Court to grant plaintiffs' motion for preliminary injunction. As the moving party, plaintiffs in the above-captioned action had to "produce evidence sufficient to convince the court that in the absence of relief [they] will suffer irreparable injury." *Crouch*, 905 F. Supp. at 255. Plaintiffs must do more than merely allege in conclusory terms that they will suffer irreparable injury should they not receive the requested injunctive relief. *See Northeastern Florida Chapter of Ass'n of General Contractors v. Jacksonville*, 896 F.2d 1283, 1286 (11th Cir. 1990) (concluding that an insufficient basis existed for finding irreparable injury based on conclusory statements regarding irreparable injury in a verified complaint coupled with a judicial determination that any calculation of financial hardship to the plaintiffs would be difficult).

Plaintiffs failed to adequately prove a causal connection between possible harm to Vessup Bay and the source of that harm, i.e., silt

flowing into the bay.[31] Even if plaintiffs were able to convince this Court that the Project site was the source of the sedimentation that appeared in Vessup Bay in mid-January of this year, which plaintiffs were not able to do, this Court made a finding that the mitigation measures were adequate. The lifting of the TRO will permit additional mitigation measures to be put into place.

█ Furthermore, plaintiffs failed to prove that in the absence of a preliminary injunction irreparable harm would occur to Tree Boas that the Court could not find actually exist on the Project site.

In addition, plaintiffs allege that their rights to "use and enjoy [] their property" will be abridged should this Court not grant plaintiffs' motion for preliminary injunction. Other than making this conclusory statement in the Amended Complaint, plaintiff did little to prove this allegation. This conclusory statement provides a legally insufficient basis for the Court to conclude that irreparable harm will befall plaintiffs should this Court deny plaintiffs' motion. *See Northeastern Florida Chapter of Ass'n of General Contractors*, 896 F.2d at 1286. Plaintiffs failed to clearly indicate to the Court how they will suffer irreparable harm.

*e. Balance of harms*

█ Plaintiffs failed to satisfy the prong of the preliminary injunction test that requires a balancing of interests. A court's decision to grant injunctive relief must not "result in greater harm to the non-moving party." *Crouch*, 905 F. Supp. at 255. Part of FEMA's mission under the Stafford Act is to provide emergency shelter, including temporary housing. FEMA must do so in an expeditious manner once the President of the United States declares an area a disaster area. Many people in the Virgin Islands live in homes damaged by Hurricane Marilyn or in emergency shelters. These people will continue to suffer harm if they remain in their current living conditions. FEMA will suffer harm if it cannot fulfill its congressional mandate.

---

[31] Even assuming, *arguendo*, that plaintiffs had been able to prove that the Project site was the source of the silt-laden runoff that they claimed polluted Vessup Bay following rains on or about January 11, 1996, this Court received evidence that the harm was already done.

Plaintiffs failed to convince this Court that they will suffer harm if this Court issues a preliminary injunction. Any possible harm to plaintiffs fail to tip the balance in their favor. Consequently, plaintiffs failed to satisfy this prong of the test.

*f. Public Interest*

The injunctive relief granted by a court must be in the public interest. *Crouch,* 905 F. Supp. at 255. The federal defendants contended that the public interest will be served by safeguarding FEMA's ability to act in the aftermath of a major disaster such as Hurricane Marilyn. FEMA provides assistance to affected areas under authority granted to it by the Stafford Act. A devastating blow would be dealt to people faced with coping with disaster if FEMA was unable to carry out those duties.

■ Thousands of people in the Virgin Islands were affected by Hurricane Marilyn, with many people having had to face loss of their homes and most personal possessions. VIHA, the Governor of the Virgin Islands, and FEMA are attempting to provide assistance to several hundred persons in dire need of temporary emergency housing. Preventing that temporary housing from being built at Nazareth will not be in the best interest of the public.

The Court recognizes the need for protection of the environment. Defendants, however, acted in an environmentally conscious manner while still providing for the needs of those in dire need of temporary emergency housing. Plaintiffs failed to satisfy this final prong of the test.

## VI. CONCLUSION

After analyzing the four factors relevant to the determination of whether to grant a preliminary injunction, this Court concludes that it must not issue a preliminary injunction in the above-captioned action. Accordingly, for the foregoing reasons plaintiffs motion for a preliminary injunction will be denied. An appropriate order follows.

DATED this 15th day of February, 1996.

THIS MATTER comes before the Court on plaintiffs' motion for a preliminary injunction. Defendants opposed the motion. The

parties presented evidence and arguments to this Court from January 29 through January 31, 1995.

After considering the evidence adduced, oral arguments, and written memoranda of counsel and for the reasons disclosed in the Opinion of even date, it is hereby

ORDERED that plaintiffs' motion for preliminary injunction is DENIED. It is further

ORDERED that the Temporary Restraining Order entered in the above-captioned action is DISSOLVED. It is further

ORDERED that plaintiffs' Motion to Amend Caption and Drop or Add Plaintiffs and plaintiffs' Motion to Reopen are hereby DENIED.

It is SO ORDERED.

DATED this 15th day of February, 1996.